IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

PARKERSBURG

JACKIE MONTGOMERY MARTIN,

       Petitioner,

v.                         Case No. 6:07-cv-00014

DAVID BALLARD, Warden,
Mount Olive Correctional Complex,

       Respondent.

## PROPOSED FINDINGS AND RECOMMENDATION

Pending are Respondent's Motion to Dismiss (docket sheet document # 7) and Respondent's Motion for Summary Judgment (# 8). This matter is assigned to the Honorable Joseph R. Goodwin, Chief United States District Judge, and it is referred to the undersigned United States Magistrate Judge for submission of proposed findings and a recommendation for disposition, pursuant to 28 U.S.C. § 636(b)(1)(B).

## PROCEDURAL HISTORY AND PETITIONER'S CLAIMS FOR RELIEF

### Petitioner's criminal proceedings and direct appeal

Petitioner was charged by a Wood County grand jury in a five count indictment with kidnapping (Count One), aggravated robbery (Count Two), impersonating a police officer (Count Three), extortion (Count Four), and sexual abuse in the first degree (Count Five) (Case No. 00-F-26). All of these charges arose out of events that allegedly occurred on January 6, 2000, in and around

Williamstown, West Virginia and Marietta, Ohio, and involved a woman named Meredith Johnson. The evidence presented at Petitioner's trial will be discussed in greater detail below.

Petitioner was represented throughout all of his criminal proceedings by attorney Lee F. Benford II. A jury trial took place on May 23-26 and 30, 2000. Before the trial began on May 23, 2000, the court addressed the defendant's motion to sever Count Three, the charge of impersonating a police officer, which is a misdemeanor. The conduct that led to that charge was alleged to have occurred on dates in addition to January 6, 2000, the date the other crimes allegedly occurred. (# 8, Ex. 8 at 21-24).

In conjunction with that motion, the court addressed the State's motion for admission of evidence under Rule 404(b) of the West Virginia Rules of Evidence, in which the State sought to admit evidence that Petitioner had told Meredith Johnson that he was an undercover narcotics officer. The State intended to use this evidence to demonstrate Ms. Johnson's state of mind at the time of the events that form the basis of the charges in the indictment. The State argued that Ms. Johnson's belief that Petitioner was a law enforcement officer deterred her from telling someone what was happening to her on January 6, 2000. (Id. at 24-27). The trial court, the Honorable Robert A. Waters, heard argument from both parties on these issues.

Concerning the charge of impersonating a police officer, the State was prepared to present evidence concerning specific instances of Petitioner engaging in conduct where he led Ms. Johnson to believe he was working as an undercover drug officer, as well as an apparent prior conviction for such an offense. However, the State conceded that if the court were to sever that count, they would not necessarily plan to introduce all of that evidence, if they could at least elicit from Ms. Johnson that Petitioner had told her he was an undercover officer, and that her belief that such information was true, "was an integral part of why she acted the way she did that day, and why this gentleman had so much control and power over her during that period of time and why she took his threats so seriously." (Id. at 27).

Mr. Benford disputed this reasoning, stating that Ms. Johnson had stated that she feared Petitioner because of the alleged threats he had made against her and her family that day, and not from his alleged impersonation of a police officer. (Id. at 28-30). Mr. Benford further argued that such evidence would be unduly prejudicial. (Id. at 30-34).

Judge Waters ultimately ruled as follows on this issue:

THE COURT: Okay. Out of an abundance of caution and the fact that Mr. Martin's indicated he might have a separate defense to Count 3, and he may, at least in his motion, he hasn't spoken of it today, but indicated he may or may not testify, and Count 3, if it went to trial, as opposed to Counts 1, 2, 4 and 5, and the fact that it happened prior to January 6th of 2000, I'm going to sever Count 3.

3

However, from the representations, it sounds very likely that at least some of the evidence is going to come in under 404(b), and I think the State's required to give the specific reason why this evidence would come in under 404(b).

* * *

MS. BOYLEN: The specific evidence about Meredith understanding, our specific evidence why that would come in would go to her state of mind, to the way she acted, the way she acted -- It would provide a complete picture as to why she did not do things the jury might think she should have done when she was outside his presence for a short period of time . . . . We're only talking about Meredith's testimony with regards to her believing he was an undercover agent, is that correct?

THE COURT: Yes, at this point. * * *

Okay.  Since there is no dispute as to what her testimony would be in this area, she believed he was an undercover narcotics police officer, the Court would find that that would be relevant evidence, but its probative value is [not?] outweighed by its prejudicial effect; that it does go to show the issues the State has indicated; it would go to show her state of mind as to duress and fear that she felt at the time of the alleged offenses.  It also appears from the representations of Counsel that it would be essential in explaining what happened that day.  The Court will give a cautioning instruction as to the use of that evidence.

However, at this point, I'm limiting it to the fact that she would testify that she believed he was an undercover police officer and what effect that should have upon her.  If the State wants to go further with that, we'll have to have a further in-camera hearing and have additional rulings under Rule 404(b).

(Id. at 42-45).  In other words, Ms. Johnson would be permitted to

testify that Petitioner had told her he was an undercover narcotics

officer, but any evidence of particular actions Petitioner may have

taken in impersonating a police officer had not, at that time, been

4

ruled to be admissible.

After four days of testimony, jury instructions, and closing arguments, the jury deliberated during the afternoon of Thursday, May 25, 2000, all day on Friday, May 26, 2000, and returned a verdict on the following Tuesday, May 30, 2000.[1] The jury found Petitioner guilty of kidnapping, and made a recommendation of mercy. The jury also found Petitioner guilty of aggravated robbery, extortion and sexual abuse in the first degree. Petitioner's subsequent motions for a judgment of acquittal or a new trial were denied.

On July 14, 2000, Petitioner was sentenced to 40 years on the aggravated robbery charge (Count Two), to be served first. Petitioner was also sentenced to one to five years on the charge of sexual abuse in the first degree (Count Five), which was to be served consecutively to the aggravated robbery sentence. Petitioner was also sentenced to serve a term of life in prison, with the possibility for parole after ten years, on the kidnapping charge (Count One), and that sentence runs consecutively to the previous sentences. Finally, Petitioner was sentenced to one to five years on the extortion charge (Count Four), and that sentence runs concurrently with Counts Two, Five, and One. (# 8, Ex. 8 at 570-571; # 8, Ex. 3).

---

[1]   Monday, May the 29th was a holiday and court was not in session.

On February 28, 2001, Petitioner filed a Petition for Appeal in the SCAWV, assigning the following errors:

1.   The Court erred in granting the State's Motion to allow the use of 404B evidence in the State's case in chief regarding impersonation of a police officer.

2.   The Court erred in ruling that the defendant could not testify in his case in chief so as to deny the allegations that he had impersonated a police office without opening the door to allow the State on rebuttal to introduce more detailed and additional 404b evidence regarding impersonation of a police officer.

3.   The Court erred in ruling that the State could cross-examine defendant on the allegations of impersonating a police officer even if the defendant offered no testimony on direct examination about these allegations.

4.   The Court erred in ruling that the State could introduce certain detailed evidence regarding impersonation of a police officer even though such evidence had only been disclosed to the defendant five days before the commencement of the trial and defendant's investigation thereof had not been completed.

5.   The Court erred in denying Defendant's Motion for Judgment of Acquittal at the close of the State's case.

6.   The Court erred in denying Defendant's Motion for Judgment of Acquittal after the close of the Defendant's evidence.

7.   The verdict was against the weight of the evidence.

8.   The verdict was contrary to law.

9.   The Court erred in allowing the State of West Virginia, over defendant's objections, to play an audio recording at the defendant's sentencing hearing of the events surrounding the arrest of the defendant.

6

10. The cumulative effect of the many errors committed in this trial was such that the Defendant was deprived of a fair trial.

11. The sentences imposed are disproportionate, excessive and violate the constitutional prohibition against cruel and unusual punishment.

12. For such other matters apparent to the Court or that may come to the attention of the Defendant upon review of the trial transcript.

(# 8, Ex. 4). The SCAWV refused the Petition for Appeal on May 9, 2001. (Id.)

### Petitioner's state court habeas corpus proceedings

On May 6, 2002, Petitioner filed a pro se Petition for a Writ of Habeas Corpus in the Circuit Court of Wood County (State ex rel. Martin v. Coleman, which was addressed under Petitioner's criminal case number, 00-F-26). (# 8, Ex. 5). The pro se petition raised only one claim, stating that Petitioner was denied the right to effective assistance of counsel because "Petitioner had witnesses that [were] not called or investigated." (Id. at 4).

Subsequently, on January 23, 2003, attorney Patrick N. Radcliff was appointed to represent Petitioner in his state court habeas corpus proceedings. (# 8, Ex. 6 at 1). On July 31, 2003, Mr. Radcliff filed an Amended Petition. (Id.) He subsequently filed three supplemental pleadings related to the Amended Petition. (Id.) The Respondent filed answers to each of those documents. (Id.) An omnibus hearing was held on January 8, 2004. (Id.) This court was not provided any of those documents, including the

7

Amended Petition.

On May 1, 2006, Judge Waters entered an "Opinion Order Denying a Writ of Habeas Corpus Following Omnibus Hearing." (Id.)  Based upon a review of this Opinion Order, it appears that Petitioner raised the following grounds for relief in his Circuit Court habeas petition, as amended:

1.  Alleged violation of Petitioner's right to due process of law . . . by possible presence of jurors on the jury who were related or acquainted with members of local law enforcement.

2.  Alleged violation of Petitioner's right to a fair trial and to equal protection of the laws . . . by presence of racial bias and racial discrimination against the Petitioner by members of the Grand Jury.

3.  Alleged violation of double jeopardy by the imposition of multiple sentences for acts occurring as part of one transaction.

4.  Alleged violation of Petitioner's rights against disproportionate, cruel and unusual punishment . . . by sentencing Petitioner to a cumulative sentence of life plus forty years plus one to five, amounting to a mandatory minimum period of incarceration of twenty one years.

5.  Alleged error by trial court granting State's motion to allow the use of 404(b) evidence that Defendant impersonated a police officer.

6.  Alleged trial court error by ruling Defendant could not testify without subjecting himself to the introduction of more detailed and additional 404(b) evidence regarding impersonating a police officer.

7.  Alleged trial court error by ruling Defendant could be cross-examined on the allegations of impersonating a police officer even if Defendant offered no testimony on direct examination about the allegations.

8

8.    Alleged trial court error by ruling State could introduce certain detailed evidence regarding impersonation of a police officer even though such evidence had only been disclosed 5 days prior to trial.

9.    Alleged insufficient evidence to support conviction of kidnapping.

9A.   (Amended Petition) - Evidence was insufficient to support a conviction of robbery, aggravated or non-aggravated.

10.   (Amended Petition) - Hearsay testimony of M. Sinclair was improperly admitted under West Virginia Rules of Evidence , R. 801(d)(1)(B).

11.   The Court erred in sentencing Petitioner to life in prison for kidnapping.

12.   The Court erred in failing to give an instruction for non-aggravated robbery.

13.   Ineffective assistance of counsel.

14.   Defendant's rights to be free from unreasonable search and seizure . . . were violated by the unlawful arrest of defendant and seizure of certain monies from his person.

15.   Defendant argues the inclusion of entry "04-05-82 Rape (East Cleveland, Ohio), No indictment filed." on the Presentence Investigation Report prejudiced the Court in sentencing.

16.   Alleged improper jury selection through the systemic exclusion of African-Americans.

(Id.)  The Opinion Order addressed the merits of each of these claims, and denied the petition in its entirety.  (Id.)

### Petitioner's state habeas appeal

On September 18, 2006, Petitioner, by counsel, Mr. Radcliff, filed a Petition for Appeal from the denial of his state habeas

9

corpus petition in the SCAWV.  The Petition for Appeal raised the

following grounds for relief:

1.  Petitioner's right against double jeopardy as guaranteed by the Fifth and Fourteenth Amendments to the U.S. Constitution and Article III, § 10 of the Constitution of West Virginia [was violated] by the imposition of multiple sentences for acts occurring as part of one transaction.

2.  The evidence was legally insufficient to support a conviction for kidnapping.

3.  The trial court erred in sentencing the Petitioner to life imprisonment for kidnapping and should have sentenced him to a term of years in prison under W. Va. Code, § 61-2-14a(a)(3).

4.  Defendant was denied his right to effective assistance of counsel in violation of his constitutional rights under the 6th and 14th Amendments to U.S. Constitution and Article III, § 14 and 21 of the Constitution of West Virginia, based upon the following grounds:

   a.  Counsel failed to conduct an investigation into the date of a certain television broadcast and for that reason ineffectively questioned Petitioner's witness, J. Wunder (T.T., p. 363), which ineffectiveness destroyed Petitioner's alibi defense.

   b.  Counsel failed to request a lesser included instruction for non-aggravated robbery and failed to raise the issue on appeal.

5.  The trial court erred in failing to give an instruction for non-aggravated robbery.

6.  The evidence was legally insufficient to support a conviction of robbery, aggravated or non-aggravated.

7.  The trial court erred in ruling under West Virginia Rules of Evidence, R. 801(d)(1)(B) that hearsay

testimony from M. Sinclair was admissible and
thereby denied Petitioner a fair trial.

8.  Defendant's rights to a fair trial and due process
    of law and to equal protection of the laws as
    guaranteed by the Fifth and Fourteenth Amendments
    to the U.S. Constitution and Article III, § 10 of
    the Constitution of West Virginia were violated by
    the presence of racial bias and racial
    discrimination against the defendant by members of
    the [G]rand Jury.

9.  The trial court erred in granting the State's
    motion to allow the use of evidence that the
    Petitioner had impersonated a police officer under
    Rule 404(b).

10. Petitioner's rights against disproportionate, cruel
    and unusual punishment as guaranteed by the 8th and
    14th Amendments of the U.S. Constitution and § 10
    of the West Virginia Constitution were violated by
    a cumulative sentence of life, plus forty years
    plus one to five, amounting to a mandatory minimum
    period of incarceration of twenty one years.

11. Petitioner's right against double jeopardy as
    guaranteed by the Fifth and Fourteenth Amendments
    to the U.S. Constitution and Article III, § 10 of
    the Constitution of West Virginia [was violated] by
    the convictions and sentences for both robbery and
    extortion.

12. Petitioner's rights to due process of law as
    guaranteed by the Fifth and Fourteenth Amendments
    to the U.S. Constitution and Article III, § 10 of
    the Constitution of West Virginia were violated by
    the presence on the jury of a first cousin by
    marriage to Detective Rick Woodyard.

(# 8, Ex. 7).  By Order entered on November 28, 2006, the SCAWV

refused the Petition for Appeal.  (Id.)

### The instant federal habeas corpus petition

On January 9, 2007, Petitioner, acting pro se, filed the

instant Petition for a Writ of Habeas Corpus under 28 U.S.C. §

11

2254, alleging the following grounds for relief[2]:

1.  Petitioner's right against double jeopardy as guaranteed by the Fifth and Fourteenth Amendments to the Constitution of the U.S.A. was violated by the imposition of multiple sentences for acts occurring as part of one transaction.

2.  Petitioner was denied his constitutional right to the meaningful and effective assistance of counsel as secured by the Sixth and Fourteenth Amendments to the Constitution of the U.S.A.

    a.  Counsel failed to conduct an investigation into the date of a certain television broadcast and subsequently failed to effectively question Janet Wunder, a key defense witness.

    b.  Defense Counsel failed to request [] lesser included instructions for robbery in the second degree and false imprisonment.

3.  The life sentence imposed on Petitioner for kidnapping and the forty years sentence imposed on Petitioner for robbery in the first degree violate the constitutional prohibition against cruel and unusual punishment, the ex post facto clause and due process of law.

4.  Petitioner was denied an impartial jury trial as secured by the Sixth and Fourteenth Amendments to the Constitution of the U.S.A. when the Trial Court failed to give the instructions for robbery in the second degree and false imprisonment.

5.  There was insufficient evidence of a "threat or presenting of firearm" to convict Petitioner of aggravated robbery and, therefore, there is a violation of due process of law as secured by the 5th and 14th Amendments to the Constitution of the

---

[2]  In his federal petition, Petitioner refers to these grounds as 12(A) through 12(M), in accordance with the sections of the form petition.  For ease of reference, the undersigned will refer to the grounds as Grounds 1-12 in this document.

12

U.S.A.

6.   Petitioner was denied his right to an indictment returned by a properly constituted and impartial grand jury as secured by the guarantees of a fair trial under the Sixth Amendment to the U.S. Constitution, the equal protection component of the due process clause of the Fifth Amendment to the U.S. Constitution and the equal protection of the laws as guaranteed by the Fourteenth Amendment to the Constitution of the U.S.A.

7.   Petitioner was denied his right to a jury panel of twenty qualified prospective jurors "free of exception" as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the Constitution of the U.S.A. when Sharon Woodyard was selected for the petit jury.

8.   There was insufficient evidence of essential statutory elements of the offense of kidnapping and insufficient evidence to satisfy the preconditions of a life sentence, and, therefore, there is a violation of the due process of law as secured by the Fifth and Fourteenth Amendments to the Constitution of the U.S.A.

9.   The trial court erred in sentencing Petitioner to life imprisonment for kidnapping and should have sentenced Petitioner to a definite sentence between twenty and fifty years in prison under WV Code § 61-2-14a(a)(3).

10.  The Circuit Court of Wood County, WV denied Petitioner his right to present a complete defense as secured by the U.S. Constitution.

   a.   The Trial Court erred in ruling under WV Rules of Evidence, Rule 801(d)(1)(B) that hearsay testimony from M. Sinclair was admissible and thereby denied Petitioner a fair trial.

   b.   The Trial Court erred in granting the State's motion to allow the use of evidence that the Petitioner had impersonated a police officer under Rule 404(b).

13

11. Petitioner's right against double jeopardy as guaranteed by the Fifth and Fourteenth Amendments to the Constitution of the U.S.A. [was violated] by conviction and sentence for robbery and extortion for the same transaction.

12. The cumulative effect of the errors enumerated and described above denied Petitioner his right to a fair and impartial trial as guaranteed by the Fifth, and Fourteenth Amendments to the Constitution of the U.S.A.

Id.)

On March 30, 2007, as ordered by the undersigned, Respondent filed an Answer (# 6), a Motion to Dismiss (# 7), a Motion for Summary Judgment, with exhibits (# 8), and a Memorandum of Law in support thereof (# 9). On April 4, 2007, the undersigned entered an Order, pursuant to the holding in Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), advising Petitioner of his right to respond to Respondent's motions and setting deadlines for the response and a reply brief. (# 10).

On April 18, 2007, Petitioner filed a "Response in Opposition to Respondent's Motion to Dismiss" (# 11). On May 4, 2007, Petitioner filed a "Traverse" in opposition to Respondent's Motion for Summary Judgment (# 12). Respondent did not file a reply. This matter is ripe for determination.

## TIMELINESS AND EXHAUSTION OF STATE COURT REMEDIES

Respondent's Answer (# 6) does not challenge the timeliness of Petitioner's federal petition, or the exhaustion of state court remedies concerning any of the claims therein. Based upon the

14

undersigned's review of the record, it appears that Petitioner's federal petition is timely. However, it appears that several of the claims alleged in Petitioner's federal petition were not colorably exhausted in the state courts. Nevertheless, because those claims lack merit, they will be addressed and denied, pursuant to 28 U.S.C. § 2254(b)(2).

### **STATUTES OF CONVICTION**

Following is the applicable statutory language for each of the crimes of which Petitioner was convicted. During the course of Petitioner's criminal proceedings, the West Virginia Legislature amended the language of the statute concerning robbery. The amendment became effective on June 4, 2000. Petitioner was charged with aggravated robbery on January 6, 2000; he was convicted of that crime on May 30, 2000; he was sentenced on July 14, 2000.

### Aggravated robbery

The statutory language in effect at the time that Petitioner was charged and convicted read as follows:

> W. Va. Code § 61-2-12. Robbery or Attempted Robbery; Penalties; Bank Robbery and Assaults in Committing or Attempting; Penalties. -
>
> If any person commit, or attempt to commit, robbery by partial strangulation or suffocation, or by striking or beating, or <u>by other violence to the person, or by the threat or presenting of firearms</u>, or by other deadly weapon or instrumentality whatsoever, he shall be guilty of a felony, and, upon conviction, shall be confined in the penitentiary <u>not less than ten years</u>. If any person commit, or attempt to commit, a robbery in any other mode or by any other means, except as provided for in the succeeding paragraph of this section, he shall be guilty

15

of a felony, and, upon conviction, shall be confined in the penitentiary not less than five nor more than eighteen years.

W. Va. Code § 61-12-2 (1961)(emphasis added).  The code section that was in effect at the time of Petitioner's sentencing reads:

W. Va. Code § 61-2-12. Robbery or attempted robbery; penalties.

(a) Any person who commits or attempts to commit robbery by: (1) Committing violence to the person, including, but not limited to, partial strangulation or suffocation, or by striking or beating; or (2) uses the threat of deadly force by the presenting of a firearm or other deadly weapon, is guilty of robbery in the first degree and, upon conviction thereof, shall be imprisoned in a state correctional facility not less than ten years.

(b) Any person who commits or attempts to commit robbery by placing the victim in fear of bodily injury by means other than those set forth in subsection (a) of this section . . . shall be guilty of robbery in the second degree and, upon conviction thereof, shall be confined in a correctional facility for not less than five nor more than eighteen years.

W. Va. Code § 61-2-12 (June 4, 2000)(emphasis added).

The SCAWV has held:

When a criminal defendant is convicted of a crime and the penal statute defining the elements of the crime and prescribing the punishment therefor is repealed or amended after his/her conviction of the crime but before he/she has been sentenced therefor, the sentencing court shall apply the penalties imposed by the statute in effect at the time of the offense, except where the amended penal statute provides for lesser penalties.

Syl. Pt. 6, State v. Easton, 510 S.E.2d 465 (W. Va. 1998).  In the instant case, the amendment to W. Va. Code § 61-2-12 concerning robbery did not alter the penalties for what is now referred to as aggravated robbery and non-aggravated robbery.

16

Thus, the undersigned proposes that the presiding District Judge **FIND** that the appropriate statutory language upon which to address Petitioner's conviction and sentence for aggravated robbery is the 1961 statute - the first one listed above - which was the statute in place at the time the offenses were allegedly committed and at the time that Petitioner was convicted.  Thus, to the extent that Petitioner has argued throughout his pleadings that the 2000 statute should have governed his jury instructions and his sentence, those claims lack merit and will be denied <u>infra</u>.

Extortion

> W. Va. Code § 61-2-13.  Extortion or attempted extortion by threats; penalties.
>
> If any person threaten injury to the character, person or property of another person, or the character, person or property of his wife or child, or to accuse him or them of an offense, and thereby extort money, pecuniary benefit, or any bond, note or other evidence of debt, he shall be guilty of a felony, and, upon conviction, shall be confined in the penitentiary not less than one nor more than five years.  And if any person make such threat of injury or accusation of an offense as herein set forth, but fail thereby to extort money, pecuniary benefit, or any bond, note or other evidence of debt, he shall be guilty of a misdemeanor, and upon conviction, shall be confined in jail not less than two nor more than twelve months and fined not less than five hundred dollars.

W. Va. Code § 61-2-13.

Kidnapping

> W. Va. Code § 61-2-14a.  Penalty for enticing away, kidnapping or holding hostage any person.
>
> (a) Any person who, by force, threat, duress, fraud, or enticement take, confine, conceal or decoy, inveigle or

17

entice away, or transport into or out of this state or within this state, or otherwise kidnap any other person, or hold hostage any other person for the purpose or with the intent of taking, receiving, demanding or extorting from such person, or from any other person or persons, any ransom, money or other thing, or any concession or advantage of any sort, . . . shall be guilty of a felony, and, upon conviction, shall be punished by confinement by the division of corrections for life, and, notwithstanding the provisions of article twelve [§§ 62-12-1 et seq.], chapter sixty-two of this code, shall not be eligible for parole: Provided, That the following exceptions shall apply: (1) A jury may, in their discretion, recommend mercy, and if such recommendation is added to their verdict, such person shall be eligible for parole in accordance with the provisions of said article twelve; . . . (3) in all cases where the person against whom the offense is committed is returned, or is permitted to return, alive, without bodily harm having been inflicted upon him, but after ransom, money or other thing, or any concession or advantage of any sort has been paid or yielded, the punishment shall be confinement by the division of corrections for a definite term of years not less than twenty nor more than fifty; (4) in all cases where the person against whom the offense is committed is returned, or is permitted to return, alive, without bodily harm having been inflicted upon him, but without ransom, money or other thing, or any concession or advantage of any sort has been paid or yielded, the punishment shall be confinement by the division of corrections for a definite term of years not less than ten nor more than thirty.

W. Va. Code § 61-2-14a.

## Sexual abuse in the first degree

W. Va. Code § 61-8B-7.  Sexual abuse in the first degree.

(a) A person is guilty of sexual abuse in the first degree when:

(1) Such person subjects another person to sexual contact without their consent, and the lack of consent results from forcible compulsion;

* * *

18

(b) Any person who violates the provisions of this section shall be guilty of a felony, and, upon conviction thereof, shall be imprisoned in the penitentiary not less than one year not more than five years, or fined not more than ten thousand dollars and imprisoned in the penitentiary not less than one year nor more than five years.

W. Va. Code § 61-8B-7.

### <u>FACTUAL BACKGROUND AND TRIAL TESTIMONY</u>

The following facts are derived from testimony taken at Petitioner's trials and other hearings:

### <u>Trial testimony</u>

According to Meredith Johnson's testimony, she met Petitioner around Thanksgiving of 1999, and they continued to see each other until the date of the alleged incident. (# 8, Ex. 8 at 138). Petitioner had met Ms. Johnson's family, and spent time with her two children. (<u>Id.</u> at 138, 193). Ms. Johnson stated that she really cared for Petitioner and desired a long-term relationship with him. (<u>Id.</u> at 191). She testified that she did not know that Petitioner was married. (<u>Id.</u> at 177-178).

Ms. Johnson testified that Petitioner had told her that he was an undercover narcotics officer. (<u>Id.</u> at 138). However, Ms. Johnson further testified that, on January 5, 2000, Petitioner called her and stated that he was in trouble, that he was in jail, and needed money. When Ms. Johnson told him she couldn't get the money, Petitioner allegedly threatened to kill her. (<u>Id.</u> at 139-140).

19

Ms. Johnson next heard from Petitioner the following morning, January 6, 2000, after she arrived at work at a Farm Fresh convenience store. Ms. Johnson testified that she normally works from about 4:30 a.m. to 12:30 p.m., and she is responsible for opening up the store. (Id. at 135-136, 142-143). Petitioner allegedly called her five or six times that morning, demanding money (specifically $ 150), and threatening Ms. Johnson and her children. (Id. at 143-145, 147-148). Ms. Johnson was so upset that she called her boss, Jean Boron, and asked if she could leave the store. Ms. Boron requested that Ms. Johnson wait for her co-worker, Brad Zoller to arrive, before she left. (Id. at 145).

Mr. Zoller arrived at the store around 7:00 a.m. He testified that Ms. Johnson was visibly upset. Id. at 213. When Ms. Johnson told him about the phone calls, she asked him to listen in on a call. So, Ms. Johnson paged Petitioner and he called her back from an "out of area" number. (Id. at 146-147, 214). Apparently, Petitioner's demeanor on that phone call was "extremely nice" and Ms. Johnson testified that Petitioner exhibited "a completely different personality." (Id. at 146, 186).

Ms. Boron subsequently arrived at the store around 7:30. She permitted Ms. Johnson to leave work early, and advised her to go to the police. (Id. at 224). Before Ms. Johnson left the store, she asked Ms. Boron if she could have an advance on her paycheck, but was refused. (Id. at 147-148). Ms. Boron testified that she

20

refused to give Ms. Johnson the money because she was afraid that she would give it to Petitioner.  (Id. at 223-224).  According to a video surveillance camera, Ms. Johnson left the store at 8:12 a.m.

Ms. Johnson further testified that she left the store, intending to go to her apartment, and got about a half a block away, when Petitioner pulled up in his white Ford Explorer.  She stated that he opened the passenger door and demanded that she get in the truck.  (Id. at 151).  She further testified that she told him she didn't want to get in the truck, but Petitioner had his hand inside his shirt, and she feared that he had a gun, so she got in.  (Id. at 152).

Ms. Johnson testified that they went to her apartment, and once inside, Petitioner screamed at her, and physically assaulted her, and continued to threaten to kill her and her children if she didn't give him $150.  Specifically, Ms. Johnson testified that Petitioner twisted her neck really hard and stated, "Just imagine if I had broken your fucking neck!"  (Id. at 153).  She stated that he also grabbed her wrist so hard that it was visibly bruised.  (Id. at 155, 176, 278, 292).

While they were at her apartment, Ms. Johnson's grandmother, Selma Anderson, arrived.  Mrs. Anderson, who was caring for Ms. Johnson's daughter at her house, because the little girl was home sick from school, stopped at the Farm Fresh to see Ms. Johnson and

21

learned that she had left work.  (<u>Id.</u> at 231-233).  Mrs. Anderson
was angry because she thought that Ms. Johnson had left work early
to be with Petitioner.  (<u>Id.</u> at 155, 235-236).  Mrs. Anderson
stayed at Ms. Johnson's apartment for just a few minutes, and she
testified that, although Ms. Johnson seemed nervous and upset, she
did not believe anything was wrong at that time.  (<u>Id.</u> at 235-236,
240).

     Ms. Johnson further testified that, after Mrs. Anderson left,
she and Petitioner drove in her mother's car to Marietta, Ohio
(which is just across the Ohio River from Williamstown), to a
business called National Check Exchange, where Ms. Johnson obtained
credit in the form of a check for $150.   (<u>Id.</u> at 156-158).
Petitioner allegedly remained in the car while she got the check.

     The individual who assisted Ms. Johnson at the National Check
Exchange was Melissa Guinn.  Ms. Guinn testified that Ms. Johnson
came in by herself that morning, and that she did not appear to be
upset or nervous, and that "she seemed like anybody else that came
in to get a loan." (<u>Id.</u> at 249, 252).  Ms. Guinn further testified
that, based upon their criteria, the maximum amount of money Ms.
Johnson was eligible to borrow was $150, plus the applicable
interest.   Thus, the total amount Ms. Johnson was charged was
$172.50.   (<u>Id.</u> at 248).  Ms. Guinn further testified that Ms.
Johnson told her the money was for her rent.  (<u>Id.</u> at 254).   Ms.
Johnson did not indicate to Ms. Guinn that there was anything wrong

at that time.  (Id. at 158-159, 255-256).

Ms. Johnson further testified that, after obtaining the check, she got back in the car and drove Petitioner back across the bridge to Williamstown.  At Petitioner's request, she dropped him off at a Pantry Store, while she went alone to the Williamstown National Bank drive-through to cash the check.  (Id. at 159-160).  She then went back and picked up Petitioner and drove back to her apartment. Throughout this time, Ms. Johnson did not tell anyone what was happening.  (Id. at 160-161).

Upon returning to her apartment, Ms. Johnson stated that she gave Petitioner the $150 in cash, and he then made her go into her bedroom, where he engaged in sexual contact with her, by biting her nipples and rubbing her crotch.  Ms. Johnson indicated that this contact was against her will.  (Id. at 162-163).  Petitioner then told her he would be back at her apartment at 9:00 p.m. that night, and threatened to kill her and/or her family, if she told anyone what had happened.  (Id. at 164).  Ms. Johnson testified that they both left her apartment around 11:00 a.m.  (Id. at 164-165).

Ms. Johnson then went to her grandmother's house and told her what had happened.  Mrs. Anderson told her to call the police.  Ms. Johnson was very hesitant to do so because she thought Petitioner was an undercover police officer and was afraid that he would find out that she had called the police.  However, Ms. Johnson was acquainted with Officer Joe Starkey, so she called him to find out

if he knew Petitioner.  (Id. at 165-166, 237).

Officer Joe Starkey testified that, around noon on January 6, 2000, he received a phone call from Ms. Johnson, who asked him if he knew Petitioner, who was an undercover agent with the Parkersburg Violent Crimes and Narcotics Task Force.  Officer Starkey stated that he had never heard of him, but could check with Detective Rick Woodyard, who was on the task force.  (Id. at 274-276).  Despite Ms. Johnson's hesitation, Officer Starkey called Detective Woodyard, who stated that he was familiar with Petitioner, and that he was not a police officer.  (Id. at 276).  Detective Woodyard then called Ms. Johnson and convinced her to meet with some plain-clothed police officers at a local restaurant.  (Id. at 320).

During that meeting, Ms. Johnson told City of Williamstown Chief of Police William Minear and Task Force Officer Jim Lott what Petitioner had done to her, and that he had said he would return to her apartment that night at 9:00 p.m.  (Id. at 291).  They convinced Ms. Johnson to go to the police station to file a report, which was taken by Officer Starkey.  (Id. at 292).

Detective Woodyard later arrived and took over the investigation.  He took a formal statement from Ms. Johnson.  (Id. at 321).  The officers then proceeded to put surveillance on Petitioner's residence.  (Id. at 322).  Around 8:30 p.m. that night, Petitioner left his house in his Ford Explorer, and was

24

arrested through a traffic stop around 8:50 p.m.  At the time of his arrest, Petitioner had $128 in cash in his pocket.  (Id. at 306-307, 322, 347).

Officer Starkey, Chief Minear, and Detective Woodyard all testified about their participation in Petitioner's arrest and the investigation of these crimes.

The State also presented testimony from Tamara Stephens, a teller at the Williamstown National Bank, and Ms. Johnson's father, Charles Anderson, who re-paid her loan to the National Check Exchange.

Petitioner's primary defense at trial was an alibi.  As noted previously herein, Ms. Johnson left the Farm Fresh at 8:12 a.m. and testified that she was immediately picked up by Petitioner.

Petitioner's wife, Cynthia Martin, testified that, on the morning of January 6, 2000, Petitioner woke up around 7:00 a.m. She stated that she heard her pager, which Petitioner was also using, go off several times and that she saw Petitioner on the phone once or twice, while she was in the bathroom getting ready for work.  Mrs. Martin stated that she did not believe that Petitioner initiated those phone calls because she never saw him dial the telephone.  (Id. at 334-336).

Mrs. Martin further testified that Petitioner, who was unemployed at the time, drove her to her job at the Bureau of Public Debt, in Parkersburg, that morning.  She stated that they

arrived at her office building around 7:50 a.m.  (Id. at 336-337).
The defense also offered testimony from various other witnesses, in
an attempt to establish Petitioner's location between 7:50 a.m. and
noon that day.

Mrs. Martin further testified that, based upon her income of
about $75,000 a year, Petitioner would not need to be asking anyone
for $150.  (Id. at 340-341).  She further testified that, after she
got off of work that evening, she and Petitioner went to a
Ponderosa restaurant and had a buffet dinner before going home.
(Id. at 339-340).  She further testified that Petitioner left their
house around 8:30 p.m. to visit a friend named Jerome.  (Id. at
343-344, 353).  Mrs. Martin stated that she had seen Ms. Johnson on
a prior occasion and understood her to be her husband's friend.
(Id. at 341-342).  Mrs. Martin testified that she had met Ms.
Johnson's children.  (Id. at 352).

Melissa Bias, an employee of Guard Cleaners, testified that
Petitioner was a regular customer of their business.  She
identified a receipt with a time stamp of 8:02 a.m. on January 6,
2000, and indicated that Petitioner had dropped off some clothes
that morning.  (Id. at 356-361).  Mrs. Martin testified that she
later picked up that dry cleaning.  (Id. at 345-347).

A woman named Janet Wunder, who was an employee of Flander's
Insurance in Marietta, Ohio, testified that Petitioner came into
her office that morning between 8:20 a.m. and 8:40 a.m., looking

for another Flander's employee named Julie Hupp.  Ms. Wunder told Petitioner that Ms. Hupp was at a doctor's appointment and she wasn't sure when she would return.  Petitioner then left the office.  (Id. at 363-367).

A woman named Tammy Hoose, who was a former neighbor of Petitioner, testified that, as she was walking to the Adult Learning Center in Marietta, Ohio, on the morning in question, Petitioner stopped and offered her a ride.  (Id. at 389-390).  She corroborated Janet Wunder's testimony that Petitioner stopped at Flander's Insurance, and stated that she waited in the car while he went in and came right back out.  She stated that Petitioner then drove her to the learning center.  (Id. at 392-393).  A sign-in sheet for January 6, 2000, indicated that Ms. Hoose signed in at the learning center at 8:45 a.m.  (Id. at 393-396).  Two other witnesses affiliated with the learning center, Mary Kearn and Wanda Meiser, testified about the sign-in process, and confirmed that Ms. Hoose was at the learning center that day.  (Id. at 373-388).

Christina Caplinger, an employee of a Dollar General Store located in Parkersburg, identified Petitioner as a customer that she waited on around 10:00 a.m. on the morning of January 6, 2000. She said she remembered that date, because it was a Thursday, which is their "truck day," and they had just started unloading their delivery truck.  Because her manager was not there that day, she worked the register, while two other employees unloaded the truck.

27

She stated that Petitioner bought a bottle of "Son-of-a-Gun." (Id. at 405-411).

Petitioner also offered the testimony of Stanley Keith Golden, who worked at a car wash in Vienna, who testified that Petitioner was a frequent customer there, and that he believed that sometime during the first week in January, Petitioner brought his car in to be washed. However, he could not pinpoint a date. Mr. Golden further testified that Petitioner brought his car in during the early morning hours, probably between 9:00 and 11:30 a.m. (Id. at 400-405).

Two employees of the Parkersburg Job Service testified that Petitioner had received an automated message about a job prospect on January 6, 2000, and that Petitioner either returned the call or came into their office to respond to the inquiry that same day. However, they could not pinpoint a time for these events. (Id. at 429-441).

Carl Howard, who was Meredith Johnson's landlord, was called as a defense witness to testify to the fact that Ms. Johnson's rent was late on January 6, 2000, and that she was frequently behind in her rent payments. (Id. at 443-445).

Mr. Benford re-called Chief Minear and brought out the fact that Ms. Johnson's statements to the police were inconsistent as to when the sexual abuse occurred. (Id. at 448-452).

28

After the trial court refused to grant Petitioner's motion <u>in limine</u> to prohibit the State from cross-examining him about evidence that he had impersonated a police officer, Petitioner did not testify at his trial. (<u>Id.</u> at 453-459).

In rebuttal, the State called a witness to testify about the date of a news broadcast pertaining to Petitioner's arrest. This testimony will be further discussed <u>infra</u>. The State also re-called Meredith Johnson and her father, Charles Anderson, to question them about their knowledge of Petitioner's marriage, and about a day that Petitioner and a friend of his came to see Meredith Johnson, while her parents were visiting. (<u>Id.</u> at 462-469).

<u>Sentencing</u>

During Petitioner's sentencing hearing, and prior to the imposition of sentence, the State asked for permission to play an audio recording of Petitioner's arrest, at which time, Petitioner apparently became belligerent with the arresting officers. (# 8, Ex. 8 at 557-558). Petitioner, by counsel, objected to the playing of the audio tape, and admitted that he was very disrespectful to the officers, but asserted that he was being arrested on charges which he claimed he did not commit, and that, combined with some prior "bad blood" he had with the police officers involved, was why he got so upset. Thus, Petitioner argued that the admission of the tape was unnecessary and was being offered only to inflame the

court against Petitioner.  (<u>Id.</u> at 559-560).  The State also asked
that Petitioner's sentences be run consecutively.  (<u>Id.</u> at 564).
Judge Waters made specific findings concerning the kidnapping and
aggravated robbery convictions to support the sentences imposed.
These findings will be discussed further <u>infra</u>.

<u>The omnibus hearing</u>

The focus of the testimony at Petitioner's omnibus hearing
chiefly concerned Petitioner's allegations of ineffective
assistance of counsel.  Testimony was taken from Petitioner's
counsel, Mr. Benford, and his investigator, Paul Morton.  Such
testimony will be discussed herein in greater detail, as necessary.

**STANDARD OF REVIEW**

Title 28, United States Code, Section 2254(d), which was
adopted as part of the Anti-terrorism and Effective Death Penalty
Act of 1996 (the "AEDPA") provides:

> An application for a writ of habeas corpus on behalf of
> a person in custody pursuant to the judgment of a State
> court shall not be granted with respect to any claim that
> was adjudicated on the merits in State court proceedings
> unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or
> involved an unreasonable application of, clearly
> established Federal Law, as determined by the Supreme
> Court of the United States; or
>
> (2) resulted in a decision that was based on an
> unreasonable determination of the facts in light of the
> evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

30

In <u>Williams v. Taylor</u>, 529 U.S. 362, 412-13 (2000), the United States Supreme Court held that under the "contrary to" clause, a federal habeas court may grant a writ of habeas corpus with respect to claims adjudicated on the merits in state court only if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or (2) if the state court decides a case differently from the Supreme Court on a set of materially indistinguishable facts.  The Court went on to note that under the "unreasonable application" test, a federal habeas court may grant a writ of habeas corpus with respect to a claim adjudicated on the merits in state court only if the state court identifies the correct governing principle from the Supreme Court's decision, but unreasonably applies that principle to the facts of the prisoner's case.  <u>Id.</u> at 413.

Moreover, the AEDPA contains a presumption that a state court's factual findings are correct:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

Respondent has filed both a Motion to Dismiss for Failure to State a Claim, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (# 7), and a Motion for Summary Judgment, pursuant

31

to Rule 56 of the Federal Rules of Civil Procedure (# 8).

Rule 56 of the Federal Rules of Civil Procedure applies to habeas corpus proceedings.  See, *e.g.*, Blackledge v. Allison, 431 U.S. 63, 81 (1977); Maynard v. Dixon, 943 F.2d 407, 412 (4th Cir. 1991).  Entry of summary judgment is appropriate when there is "'no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Rule 56(c), Fed. R. Civ. P.)  Petitioner was given a notice, pursuant to the holding in Roseboro v, Garrison, 528 F.2d 309 (4th Cir. 1975), advising him of his right and obligation to respond to Respondent's motion.  (# 11).

The undersigned has addressed the merits of each of the claims raised in Petitioner's federal petition, and has determined, in accordance with Rule 56, that Respondent is entitled to judgment as a matter of law on each of Petitioner's claims.  Thus, there is no need to address Respondent's Motion to Dismiss for Failure to State a Claim under Rule 12(b)(6).

## ANALYSIS

**1.  Grounds One and Eleven - double jeopardy.**

In both Grounds One and Eleven of his federal petition, Petitioner alleges that his conviction on multiple charges and the imposition of multiple sentences arising out of the same transaction violates his rights under the Double Jeopardy Clause of

32

the Fifth Amendment to the United States Constitution, which states: "nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const., Amend. V. The undersigned will address each claim in turn.

> a. Ground One - Petitioner's right against double jeopardy was violated by the imposition of multiple sentences for acts occurring as part of one transaction.

Although the heading of Ground One asserts a double jeopardy violation, the argument in this section really appears to concern a sufficiency of evidence claim concerning his kidnapping conviction, which will be addressed later herein. This section does, however, state the following about multiple offenses:

> The kidnapping charge in this case rests entirely upon the uncorroborated testimony of the victim and extremely tenuous vaporous proof of an essential element of the offense of kidnapping, i.e., "felonious force, threat or duress" * * *

> Even assuming the element of force was established, state law requires the alleged kidnapping to be tr[e]ated as incidental to the robbery.

(# 1 at 5-6). Thus, the crux of this claim appears to be that Petitioner's conviction of both kidnapping and aggravated robbery violated the constitutional guarantee against double jeopardy. Neither the parties, nor the state habeas court, cite to any applicable federal precedent concerning this type of claim.

The state habeas court addressed Petitioner's double jeopardy claim as follows:

33

The Court has concluded the Petitioner has failed to prove by a preponderance of the evidence that Petitioner's right against double jeopardy as guaranteed by the Fifth and Fourteenth Amendments to the U.S. Constitution and Article III, [§] 10 of the Constitution of West Virginia were violated by the imposition of multiple sentences for acts occurring as part of one transaction.

\* \* \*

In West Virginia, "the general rule is that a kidnapping has not been committed when it is incidental to another crime. In deciding whether the acts that technically constitute kidnapping were incidental to another crime, courts examine the length of time the victim was held or moved, the location and environment of the place the victim was detained, and the exposure of the victim to an increased harm." Syllabus pt. 2, State v. Miller, 175 W. Va. 616, 336 S.E.2d 910 (1985).

In order to prove his right against double jeopardy was violated, Petitioner must prove by preponderance of the evidence, with the holding of State v. Miller, taken into consideration, that a Kidnapping was not committed because the Kidnapping was incidental to the Aggravated Robbery of Meredith Johnson.

A review of the record, in light of the Miller holding, indicates that Johnson was held by the Petitioner between two to two and a half hours during which time Petitioner made Johnson drive to the bank and check cashing business, took money from Johnson, and then sexually assaulted her. Petitioner alleges that the length of time Johnson was held is much shorter due to the fact that Johnson was alone in the bank and therefore could not be still considered kidnapped. However, while Johnson may have been alone in the bank, Petitioner was waiting outside in the car. Additionally, Johnson was exposed to an increased risk of harm to herself and her family through Petitioner's repeated threats that he would kill her or her family, and confirming those threats through his actions.

From the review of the evidence, the Court finds that the use of threats, intimidation and fear to hold Johnson and make her drive Petitioner to various locations were not incidental to the Aggravated Robbery

34

of Johnson; therefore the Petitioner was properly charged
with Kidnapping.  Accordingly, upon application of the
foregoing legal authority to the finding of fact set
forth above the Court has concluded the Petitioner has
failed to prove by a preponderance of the evidence that
Petitioner's constitutional right against double jeopardy
was violated by receiving a conviction and sentence for
Aggravated Robbery and Kidnapping.

(# 8, Ex. 6 at 7-8).  In the context of a section 2254 petition,

federal courts are bound to follow the highest state court's

interpretation of legislative intent as to the availability of

multiple punishments.  Holdren v. Legursky 16 F.3d 57 (4th Cir.

1994).

The United States Supreme Court addressed the applicable

analysis for a double jeopardy claim in Blockburger v. United

States, 284 U.S. 299 (1932).  "The applicable rule is that, where

the same act or transaction constitutes a violation of two distinct

statutory provisions, the test to be applied to determine whether

there are two offenses or only one is whether each provision

requires proof of an additional fact which the other does not."

Id. at 304.  The State of West Virginia adopted this test for

determination of the constitutionality of multiple prosecutions in

State v. Zaccagnini, 380 S.E.2d 131(W. Va. 1983).

Respondent asserts that the SCAWV has "recognized that the

statutory definition of kidnapping is broad enough to encompass

'almost any forced movement or detention within the State.'"

(Citing State v. Fortner, 387 S.E.2d 812, 827-28 (W. Va. 1989),

which cites State v. Miller, 336 S.E.2d 910, 914 (W. Va. 1985)).

35

(# 9 at 14).  Aggravated robbery does not require either movement or detention of the victim.  Thus, under the <u>Blockburger</u> test, the kidnapping and aggravated robbery of Ms. Johnson were separate offenses and may be punished separately.

Accordingly, the undersigned proposes that the presiding District Judge **FIND** that Petitioner has not demonstrated a violation of the prohibition against double jeopardy under the Fifth and Fourteenth Amendments to the United States Constitution. Thus, the undersigned further proposes that the presiding District Judge **FIND** that the state courts' decisions denying habeas corpus relief on this claim were neither contrary to, nor an unreasonable application of, clearly established federal law, and that Respondent is entitled to judgment as a matter of law on this claim.

> b.  Ground Eleven - Petitioner's right against double jeopardy was violated by conviction and sentence for robbery and extortion for the same transaction.

In Ground Eleven of his federal petition, Petitioner makes a similar double jeopardy argument concerning his convictions and sentences for aggravated robbery and extortion:

> The Petitioner was convicted for both robbery and extortion even though both offenses stem from the same factual scenario.  The trial court made the sentences run concurrent to the other sentences.  Under the facts of this case, Ms. Johnson alleged [that Petitioner] threatened her with the intent of obtaining money and money was actually obtained.  All elements of extortion were subsumed within the State's proof of robbery.  In this case, the crime of extortion was a lesser included offense of robbery and petitioner's conviction for

36

robbery and extortion violates the prohibition against double jeopardy as defined by the U.S. Supreme Court in <u>Blockburger v. U.S.</u>, 28[4] U.S. 299 (1932).

(# 1 at 27).   From a review of the Opinion Order denying Petitioner's Wood County habeas corpus petition, it appears that Petitioner did not raise this specific double jeopardy claim in that petition, as amended.  He did, however, raise it in his habeas appeal.  (# 8, Ex. 7 at 44-45).

Because Petitioner did not address this claim at the Circuit Court level, it is unexhausted.  However, according to 28 U.S.C. § 2254(b)(2), "an application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." Because this claim lacks merit, the undersigned will address it, notwithstanding Petitioner's failure to properly exhaust his state court remedies.

Petitioner's claim asserts that he should not have been convicted and separately punished for both robbery and extortion. Respondent addressed this claim as follows in his Memorandum of Law:

> A conviction for robbery requires the "threat or presenting of firearms or other deadly weapon or instrumentality" in the commission of the crime. Extortion does not.  Extortion requires a threat to "the character, person or property of another or to the character, person or property of his wife or child." Robbery does not require that the defendant threaten the life or safety of the family of the victim.  Clearly, both statutes have distinct elements not contained in the other.

(# 9 at 41).   Respondent further argues:

> During the course of the crime, Petitioner promised the victim that he would not harm her or her children if she secured money for him.   The Petitioner also demanded money from the victim by threatening her safety, injuring her and indicating that he had a deadly weapon.   There is no provision in the extortion statute for the use or threatened use of a deadly weapon.   The robbery statute contains no language about the threat of harm to the victim's family.   Both crimes are distinct and separate offenses and the nature of the victim's crimes and the evidence presented at trial supports a conviction for both.   Double jeopardy was not violated.

(<u>Id.</u>)

Again, applying the <u>Blockburger</u> test annunciated above, the undersigned agrees with the analysis made by Respondent that the offenses of robbery and extortion each require proof of a different element.   Accordingly, the undersigned proposes that the presiding District Judge **FIND** that Petitioner has not demonstrated a violation of the prohibition against double jeopardy under the Fifth and Fourteenth Amendments to the United States Constitution, and that Respondent is entitled to judgment as a matter of law on this claim.

## 2.   Ground Four - Failure to give lesser-included offense instructions.

In Ground Four of his federal petition, Petitioner alleges that he was "denied an impartial jury trial" when the trial court failed to give instructions on robbery in the second degree and false imprisonment.   Petitioner asserts: "It is impossible to commit Robbery in the First Degree without first committing Robbery

38

in the Second Degree.   It is impossible to commit Kidnapping

without first committing false imprisonment." (citing <u>State v.</u>

<u>Dellinger</u>, 178 W. Va. 265, 267 (1987)). (# 1 at 15). On the issue

of instructions concerning robbery, Petitioner adds:

> Given the absence of any relevant evidence that
> petitioner possessed or presented a firearm on January 6,
> 2000, there exists a serious deficiency in the state's
> case in chief. Petitioner believes that an instruction
> on Robbery in the Second Degree was justified under the
> evidence and was fundamental to petitioner's case.
>
>                    * * *
>
> Therefore, under state law, it was incumbent upon
> the Court to instruct the jury on the elements of Robbery
> in the Second Degree. The failure of the Court to
> instruct the jury on lesser included offense denied
> petitioner the right to an impartial jury as secured by
> the Sixth and Fourteenth Amendments to the Constitution
> of the U.S.A.

(<u>Id.</u>)

Concerning his claim that the trial court also should have

instructed the jury on false imprisonment, Petitioner states:

> Given the absence of any relevant evidence that
> petitioner possessed or presented a firearm to give force
> and effect to any purported threat on January 6, 2000,
> and as the trip to Marietta was suggested by Ms. Johnson
> to resolve their argument, the essential element of
> asportation[3] is also in dispute, there exists serious
> deficiencies in the state's case in chief.
>
> Petitioner believes that an instruction on False
> Imprisonment was justified under the evidence and was
> fundamental to petitioner's case.

---

[3] "Asportation" is defined as "The removal of things from one
place to another. The carrying away of goods." BLACK'S LAW
DICTIONARY, REV. FOURTH ED., p. 147.

* * *

Therefore, under state law, it was incumbent upon the Court to instruct the jury on the elements of False Imprisonment.  The failure of the Court to instruct the jury on lesser included offense denied petitioner his right to an impartial jury as secured by the Sixth and Fourteenth Amendment to the Constitution of the U.S.A.

(Id. at 15-16).

Respondent asserts that "Petitioner offers no controlling federal precedent which holds that state trial courts are required to offer lesser included offense instructions when there is sufficient evidence to convict on the primary offense."  (# 9 at 26).  Respondent adds:

In Beck v. Alabama, 447 U.S. 625, 638 n.14 (1980) the Supreme Court declined to issue a holding on whether defendants are entitled to lesser included offense instructions on non-death penalty cases.  ("We need not and do not decide whether the Due Process Clause would require the giving of such instructions in a noncapital case.") "The Supreme Court has never recognized a federal constitutional right to a lesser included offense instruction in non-capital cases." Dockins v. Hines, 374 F.3d 935, 938 (10th Cir. 2004).

The Fourth Circuit declined to adopt a standard for non-death penalty cases on this claim and stated: "while the parties argue extensively over state law, '[i]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.'" Bates v. Lee, 308 F.3d 411, 421 (4th Cir. 2002) citing Estelle v. McGuire, 502 U.S. at 67-68.

In the case of Nichols v. Gagnon, 710 F.2d 1267, 1269 (7th Cir. 1083) cited by the Fourth Circuit in Bates the court found that in non-death penalty cases:

To transform the federal courts in the exercise of their habeas corpus jurisdiction from enforcers of specific constitutional rights to guarantors of the accuracy of state

40

court determinations of guilt would enmesh the federal judiciary in almost every detail of state criminal procedure and every trial ruling, and we would regularly have to review failures to instruct on lesser included offenses under state law as well as decide other issues unrelated to a specific federal constitutional safeguard.  We shall decline this task until directed to take it up by our judicial superiors.  Since one of the rights of criminal defendants under the due process clause of the Fourteenth Amendment is to be tried according to the fundamental contemporary norms of civilized procedure, Palko v. Connecticut, 302 U.S. 319, 58 S. Ct. 149, 82 L. Ed.2d 288 (1937), we shall continue to review failures to instruct under the standard of Peery --fundamental miscarriage of justice . . . . Id. at 1272.

* * *

Absent controlling Supreme Court or Fourth Circuit precedent [] on this issue, this Court is not required to reexamine the application of state law by a state court. Moreover, sufficient evidence to support a conviction for aggravated robbery and kidnapping in the instant case renders the absence of lesser included offense harmless. See Brecht v. Abrahamson, 507 U.S. 619, 637-38 (1993)(only errors having a substantial and injurious effect on the jury's verdict [a]re remediable in habeas corpus.).

(Id. at 26-28).

In his Traverse, Petitioner argues that the 2000 version of the robbery statute should be applied in determining how the jury should have been instructed in his case.  (# 12 at 3-4).  As has previously been determined by this court herein, it is the 1961 version of the statute that is applicable.

Petitioner further asserts that "there is an evidentiary dispute and a decisive absence of proof that petitioner had a

41

firearm," and that "'due process requires that a lesser-included offense instruction be given when the evidence warrants such an instruction.'" (Id. at 2-3)(quoting Hopper v. Evans, 456 U.S.605, 611 (1982)).  Petitioner further contends:

> A lesser-included offense instruction was warranted because the evidence actually produced at trial would permit a rational jury to find petitioner guilty of robbery in the second degree and acquit him of the greater.  It was an abuse of judicial discretion to fail to afford the jury an appropriate lesser included offense instruction.

(Id. at 3-4).  Petitioner further asserts that the instruction given to the jury did not identify "unlawfully" as an element of the offense, and "did not instruct the jury that 'the use of force or violence to the person' is an optional element which is a statutory equivalent for element six, 'by the threat of [sic; or] presenting of firearm.'" (Id. at 4).

Concerning the failure to give a lesser included offense instruction on false imprisonment when instructing the jury about the kidnapping charge, Petitioner's Traverse argues:

> In West Virginia, the common law, so far as it is not repugnant to the principles of the Constitution of West Virginia, shall remain in effect until altered or repealed by legislation.  Art. VIII, § 14, WV Constitution; WV Code § 2-1-1.  Under the common law, false imprisonment was the unlawful detention or restraint of another person for any length of time whereby she was deprived of her personal liberty.  35 C.J.S. False Imprisonment, § 71.  Twenty-three (23) state courts have determined false imprisonment is a lesser included offense of kidnapping. See, Annotation: "False Imprisonment as an Included Offense within the Charge of Kidnapping." American Law Reports, 3rd Series, Vol. 68, p. 828.  State v. Niska, 514 NW.2d 260, reh den (Minn.,

1994); <u>State v. Kyle</u>, 333 NC 687, 430 S.E.2d 412.

(# 12 at 6-7).  Petitioner further asserts that false imprisonment

meets the lesser included offense test because you cannot commit

kidnapping without having first committed false imprisonment.

(<u>Id.</u>)

The state habeas court did not specifically address

Petitioner's argument concerning the failure to give a lesser-

included offense instruction on false imprisonment.  Nevertheless,

such failure was harmless as, under West Virginia law, there is no

such crime as false imprisonment, and no statutory penalty

therefor.  This claim is absolutely meritless.

The state habeas court only addressed this claim in terms of

the failure to give an instruction on non-aggravated robbery.  The

court made the following findings, based upon state law:

> The question of whether a defendant is entitled to
> an instruction on a lesser included offense involves a
> two-part test; 1) Is the lesser offense by virtue of its
> legal elements or definition included in the greater
> offense?  and 2) Can the trial court make the
> determination that the evidence would tend to prove such
> lesser included offense?  <u>State v. Neider</u>, 170 W. Va.
> 662, 295 S.E.2d 902 (1982); 174 W. Va. 700, 329 S.E.2d 65
> (1985).
>
> Petitioner meets the first prong because it has been
> previously determined that "non aggravated robbery is a
> lesser included offense of aggravated robbery." <u>State v.</u>
> <u>Massey</u>, 178 W. Va. 427, 432 S.E.2d 865, 870 (1987).
> Therefore, our analysis is limited to whether there was
> evidence presented at trial that would tend to prove that
> Petitioner committed non aggravated robbery.

* * *

43

> [T]he element of aggravated robbery that differs from
> non-aggravated robbery is violence to the victim or the
> threat or presentation of firearms or other deadly
> weapons. [<u>State v. Phillips</u> 199 W. Va. 507, 485 S.E.2d
> 676 (1997).
>
> * * *
>
> Petitioner would be entitled to a jury instruction
> on non-aggravated robbery if there was a question of fact
> as to whether [Petitioner] threatened or presented a
> firearm or other deadly weapon.  The evidence shows when
> Petitioner opened the passenger door to his vehicle, he
> told the victim to get in and he had his "hand placed
> inside his shirt."  (T.T. pg. 152) The victim further
> testified, "I was scared," when asked what she was
> thinking at the time.  (T.T. pg. 152) The victim then
> testifies, "I thought it was a gun," when asked what she
> thought the hand under the Petitioner's shirt was.  (T.T.
> pg. 152) Petitioner presented no evidence to dispute this
> testimony.   The Court finds the evidence presented
> through the testimony of the victim, Meredith Johnson, is
> sufficient to conclude Petitioner threatened use of a
> firearm and that the victim reasonably believed
> Petitioner had possession of a firearm.  The Court could
> not conclude the evidence tends to prove the lesser
> included offense therefore Petitioner was not entitled to
> a lesser included jury instruction.

(# 9, Ex. 6 at 20-22).

As discussed above in the section on the applicable statutes,

the statute governing Petitioner's aggravated robbery charge

states:

> If a person commit, or attempt to commit, robbery by
> partial strangulation or suffocation, or by striking or
> beating, or <u>by other violence to the person, or by the
> threat or presenting of firearms</u> or other deadly weapon
> or instrumentality whatsoever, he shall be guilty of a
> felony and, upon conviction, shall be confined in the
> penitentiary not less than ten years.

W. Va. Code § 61-2-12 (1961)(emphasis added).  Based upon this

statutory language, the trial court instructed the jury as follows:

44

> Aggravated robbery is committed when one person takes or attempts to take from the person of another person or in his presence against his will any property, money or other thing of value belonging to or in the care, custody, control, management or possession of such other person by the threat of [should be "or"] presenting of firearms, with the intent to deprive the victim permanently of the property, money or other thing of value.

(# 8, Ex. 8 at 487).

Although addressed elsewhere in his Memorandum of Law, Respondent also asserts that, under West Virginia law, a defendant is not entitled to a lesser included offense instruction when an alibi defense has been raised. Respondent cites to both state and federal case law on this issue:

> The simplest illustration would be the case where the defendant relies on the defense of alibi and then asserts the right at the conclusion of the trial to have an instruction on the lesser included offense, where there is no evidence to contradict the State's case except the alibi. The defendant is not entitled to a lesser included offense instruction in this case because there is no conflicting evidence as to the commission of the greater offense except the alibi. This is a complete defense to the entire crime, including the greater and any lesser included offense, and would entitle the defendant to an acquittal if believed by the jury. However, because an alibi does not factually contest the elements of the greater offense and particularly those elements that differ from the lesser included offense, there is no basis for a lesser included offense instruction.

State v. Neider, 295 S.E.2d 902, 906 (W. Va. 1982); see also Kubat v. Thieret, 867 F.2d 351, 364-65 (7th Cir. 1989)(decision not to request lesser-included offense instruction in kidnapping case reasonable in light of defendant's alibi defense). (# 9 at 18-19).

45

Upon a thorough review of the state court records, the undersigned proposes that the presiding District Judge **FIND** that there was sufficient evidence to satisfy the elements of aggravated robbery requiring that the alleged robbery was made with a threat of a firearm, or at the very least, with other violence to the victim, Meredith Johnson. The undersigned further proposes that the presiding District Judge **FIND** that, under West Virginia law, Petitioner was prohibited from receiving a lesser-included offense instruction because he asserted an alibi defense. The undersigned further proposes that the presiding District Judge **FIND** that there is no such crime as false imprisonment under West Virginia law.

For these reasons, the undersigned further proposes that the presiding District Judge **FIND** that the failure of the trial court to give instructions about the lesser included offenses of non-aggravated robbery and false imprisonment was not fundamentally unfair or a miscarriage of justice, and therefore, Petitioner has failed to demonstrate a violation of his federal constitutional rights on this basis.

Therefore, the undersigned further proposes that the presiding District Judge **FIND** that the state courts' decisions denying Petitioner habeas corpus relief on this claim were neither contrary to, nor an unreasonable application of, clearly established federal law, and that Respondent is entitled to judgment as a matter of law on this claim.

46

**3.    Ground Two - Ineffective assistance of counsel.**

In Ground Two of his federal petition, Petitioner has asserted two claims of ineffective assistance of counsel.  The Supreme Court addressed the right to effective assistance of counsel in Strickland v. Washington, 466 U.S. 668 (1984).  In Strickland, the Court adopted a two-pronged test for determining whether a defendant was provided inadequate assistance of counsel.  The first prong is competence; Petitioner must show that the representation fell below an objective standard of reasonableness.  466 U.S. at 687-91.  There is a strong presumption that the conduct of counsel was in the wide range of what is considered reasonable professional assistance, and a reviewing court must be highly deferential in scrutinizing the performance of counsel.  Id. at 688-89.

> In order to meet the first prong, a defendant must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment.  The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance . . . . [C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

Id. at 690.

The second prong is prejudice; "[Petitioner] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id. at 694.

47

Furthermore, the AEDPA "adds a layer of respect for a state court's application of the legal standard." Holman v. Gilmore, 126 F.3d 876, 881 (7th Cir. 1997).  Using this standard, and based upon all of the evidence of record, the court will address the merit of each of Petitioner's claims of ineffective assistance of counsel.

> a.  Counsel failed to conduct an investigation into the date of a certain television broadcast and subsequently failed to effectively question Janet Wunder, a key defense witness.

Petitioner's first claim of ineffective assistance of counsel concerns the testimony of defense witness Janet Wunder.  As previously stated, Petitioner asserted an alibi defense.  He called various witnesses in an attempt to establish that he was in various locations in Marietta, Ohio during the time period that he was allegedly with Ms. Johnson, engaging in the conduct that formed the basis of the crimes of conviction.

Janet Wunder testified that Petitioner came into her office at Flanders Insurance, in Marietta, Ohio, on the morning of January 6, 2000, between 8:20 a.m. and 8:40 a.m.  She stated that Petitioner, who had been into the office before, was looking for her co-worker, Julie Hupp, who was out of the office at a doctor's appointment. (# 8, Ex. 8 at 364-367).  Mr. Benford then asked Ms. Wunder the following questions:

> Q.  Did you, the same day that you're talking about now that you saw him there between eight-twenty and eight-forty, did you have occasion later that day

48

       to see or hear something about Mr. Martin?

A.    No.

Q.    Did you see anything on the news about him?

A.    I did the next morning.  I did not that day.

Q.    Not that same day?  And what did you learn the next morning?

A.    Just the WTAP news had given his name and a photo of him and that he had been arrested.

Q.    And did you note at that time it was just the day before that he had been in your office?  Did you note in your mind I just saw him --

A.    Yes.  I recognized him, yes.

Q.    You saw that newscast the very next day after you'd seen him in your office that morning?

A.    Yes.

(Id. at 367-368).

On cross-examination, Ms. Wunder testified that she believed the day that Petitioner came into the office was a Tuesday when, in fact, January 6, 2000 was a Thursday.  (Id. at 370).  Thus, on re-direct, Mr. Benford clarified that fact with Ms. Wunder, and then asked her again about the news broadcast:

Q.    Ms. Wunder, the morning that you saw Jackie Martin there, are you sure that it was the morning before the newscast that you saw the next day?

A.    Yes.

(Id. at 371).  The prosecutor then asked Ms. Wunder how many news broadcasts she had seen about incident and she stated "I only saw one."  (Id. at 372).

49

The State called a rebuttal witness, Amy Salwachter, who was employed by WTAP-TV, the news station that allegedly broadcast the story that Ms. Wunder saw.   Ms. Salwachter testified that her station did not broadcast anything about Petitioner's arrest until the noon news show on January 12, 2000, and that there was no story at all on January 7, 2000.   (Id. at 461-462).   Mr. Benford did not cross-examine Ms. Salwachter, or request to rebut that evidence in any way.

The impeachment of Ms. Wunder's testimony is the basis of Petitioner's first ineffective assistance of counsel claim.   At his omnibus hearing, Petitioner, by his habeas counsel, Mr. Radcliff, questioned Mr. Benford and his investigator, Paul Morton, about their investigation of this issue.   Petitioner discussed the investigation in his federal petition as follows:

> Mr. Morton testified that he contacted the insurance agency and spoke to Ms. Wunder.   She confirmed that petitioner had been in their agency on January 6, 2000, at 8:30 a.m. When asked to verify the exact date, Ms. Wunder related that it was the same day that Ms. Hupp was absent for medical reasons, and that, in fact Ms. Hupp reported to work at 9:00 a.m., and Ms. Wunder told her that petitioner had been there to see her about a half-hour earlier (E.T., p. 6).

> Mr. Morton also interviewed Ms. Hupp.   She confirmed the information provided by Ms. Wunder and added that she called petitioner later on January 6, 2000 (E.T., p. 8).

> Mr. Morton gave his interview notes regarding Ms. Wunder and Ms. Hupp to Lee Benford, the defense counsel. These notes were admitted as petitioner's Exhibit No. 5.

[at the omnibus hearing][4].  The notes contain an explicit statement that "Ms. Wunder says she saw him on the news when he was arrested and recognized him."  Mr. Benford considered this information to be crucial to his client's defense because credible witnesses were specific as to the date and time of their interactions with his client (E.T., pp. 5-7, 41).  The testimony's significant [sic; significance] lay in the fact that Ms. Johnson had told the police that she was forced into petitioner's vehicle just after she left her place of employment when she was walking home and when she was "right beside the store." (T.T., p. 150).

* * *

Mr. Benford did not call Ms. Hupp to collaborate [sic; corroborate] Ms. Wunder's testimony.  If Ms. Hupp had testified she would confirm that Ms. Wunder had notified her of petitioner's visit to their agency on January 6, and provide a note from her doctor showing an appointment for that day.  (Petitioner's exhibit No. 5, pp. 38-40, E.T. pp. 13-15, 53-54).  This omission would significantly undermine petitioner's alibi defense.

Mr. Benford did not ascertain when WTAP had broadcast their news segment concerning his client.  Mr. Benford now admits that the questioning of Ms. Wunder to tie her contact with his client to the day before the news broadcast was a mistake because he did not know when the broadcast occurred.  In rebuttal, the prosecutor subpoenaed an employee of WTAP.  This individual testified that [WTAP] had not broadcast news coverage of petitioner's arrest until January 12, 2000 (T.T., p. 461).  Mr. Benford would later state, "It destroyed that part of . . . it certainly hurt the credibility of Ms. Wunder's testimony, there's no doubt about that . . . I saw the jurors roll their eyes, a couple of them" (E.T., pp. 52-53).

(# 1 at 9-11).

The undersigned has reviewed the testimony of Mr. Morton and Mr. Benford at the omnibus hearing and has confirmed that they

---

[4]  This court is not in possession of the exhibits from the omnibus hearing.

testified    consistently    with    Petitioner's    summary    above.
Additionally, Mr. Morton testified that, after Petitioner's trial
had ended, he again spoke with Ms. Wunder and Ms. Hupp.  Mr. Morton
testified as follows concerning those meetings:

> Q.   So you did go back and talk to Ms. Wunder?
>
> A.   Yes, sir.
>
> Q.   And what were you able to discover?
>
> A.   She was not aware that a rebuttal witness had come
> in from WTAP and that I revealed to her that there
> had not been a newscast until January 12th, and she
> seemed confused, "Oh, I thought I saw him on the
> news, but I remember when he came in, it was the
> day of Julie's doctor appointment."  So she once
> again was saying that the reason she remembered the
> time was not necessarily because of the news, the
> newscast specifically, but it was the day that it
> was Julie's doctor's appointment.
>
> Q.   Was she able to produce anything in writing that --
>
> A.   She had a Day Timer on her -- or calendar on her
> desk that went day by day, and on January 6th, she
> had Julie's doctor appointment written on that
> calendar.
>
> Q.   Did you ask her to give you that or give you a copy
> of it?
>
> A.   We ended up getting a copy of it delivered, I
> believe to Mr. Benford, and then she spoke -- Ms.
> Wunder was to speak with Julie Hupp and have her
> get a letter from her doctor saying that she
> actually had had an appointment that day and she
> had been at the appointment.
>
> Q.   So you also obtained a letter or had Julie Hupp
> provide documentation --
>
> A.   Julie -- I called her and she faxed me a copy.  She
> had already gotten a letter from her doctor and she
> faxed me a copy of the letter and I delivered that,

on June 6th, delivered that to Attorney Benford.

Q.   During your investigations for Attorney Benford,
     were you ever called upon to investigate whether -
     - when the news broadcast was made?

A.   The investigation that I made after that was simply
     to check local libraries and see if there was any
     other news articles that had gone on.  We couldn't
     find anyone who could locate any other newscast
     prior to January 12th.

Q.   During the trial itself or prior to the trial and
     during your investigation, had you ever been called
     upon by Mr. Benford to investigate the issue of
     whether there had been a news broadcast on January
     the 6th and 7th?

A.   No, that was never discussed.

Q.   Do you know if Mr. Benford-- there's no discussion,
     you have no knowledge of whether he might have
     undertaken something like that?

A.   No, I would have no idea.  I never heard anything
     about a newscast prior to the trial.

(# 8, Ex. 9 at 14-15).

On cross-examination, Mr. Morton stated that during their
discussions prior to trial, Ms. Wunder did not specifically connect
her testimony to the WTAP broadcast; she simply said that she had
seen it on the news.  She did, however, specifically connect
Petitioner's visit to the day that Ms. Hupp had her doctor's
appointment.  Mr. Morton stated that, at trial, it was a surprise
that Ms. Wunder linked it to the WTAP broadcast.  (Id. at 16-17).

Mr. Benford testified that he interviewed Ms. Wunder, but
doesn't think that he ever talked to Ms. Hupp, and he did not
subpoena Ms. Hupp for the trial.  (Id. at 44-45).  When asked why

53

he didn't subpoena Ms. Hupp, he stated:

> A.   At the time, the reason was I felt like Ms. Wunder
> was going to be a very good, credible witness, very
> believable witness, have a-- make a very good
> appearance to the jury - middle-aged lady working
> in an insurance office that had no connection at
> all to Mr. Martin - and I felt like that was going
> to be sufficient to establish that he was there at
> the insurance office that morning, and I wasn't
> quite as confident that Ms. Hupp would necessarily
> be-- make a good showing in front of the jury with
> pierced tongue and things of that nature.
>
> And also she was another young woman, which I was
> not necessarily wanting the jury to associate Mr.
> Martin with another young female.  We had a young
> female victim and I just felt like Ms. Wunder was
> going to be a solid enough witness to establish
> that he was there on that particular day.

(Id. at 45-46).  Mr. Benford further stated that the way Ms. Wunder

testified was not as he had expected.  (Id. at 35).

Respondent asserts that Mr. Benford's decision not to call Ms.

Hupp as a witness at trial was a matter of trial strategy, and that

no prejudice arose from Mr. Benford's failure to corroborate Ms.

Wunder's testimony.  (# 9 at 16-17).  Respondent states:

> Ms. Wunder's testimony was offered by the defense to
> demonstrate that the Petitioner was at the office of Ms.
> Wunder for a few minutes at around the same time the
> victim was abducted.  However, the time accounted for by
> Ms. Wunder were but a few moments of a crime that
> occurred over a period of hours.  (Resp't Ex. 8 at 134-
> 78.)

*  *  *

> The decision by trial counsel not to call a witness
> who he thought would reflect badly on the Petitioner was
> a clear matter of trial strategy and absent a showing of
> unreasonableness, it is not subject to review.

* * *

Even under a showing of unreasonableness this claim would still fail.  In light of the overwhelming evidence of guilt presented at trial, showing an inconsistency at most in the victim's account of the events would be far from sufficient to cast the outcome of the proceedings in doubt. [Strickland, 466 U.S.] at 693.  (A verdict "only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.")  The Petitioner has not argued how the corroboration of Ms. Wunder's testimony would have been sufficient to alter the outcome of the proceedings.  A petitioner is required to do more than speculate to demonstrate prejudice.

(Id.)

The state habeas court found as follows on this issue:

To prevail Petitioner must prove his counsel's questioning of Petitioner's witness J. Wunder was deficient under an objective standard of reasonableness. An examination of this issue begins with the legal authority governing how defense counsel is to deal with alibi defenses and witnesses during trial preparation and at trial.

Under West Virginia law ineffective assistance of counsel is established "when it is proven that counsel for a criminal defendant failed to investigate adequately a purported alibi defense and consequently failed to contact, subpoena and call alibi witnesses who were willing and able to testify for the defendant in a case in which the alibi was the defendant's sole possible defense or a material defense." State v. Glover, 335 S.E.2d 631, 635 (1987).  Petitioner's counsel, Lee Benford, investigated the purported alibi defense and called the appropriate witnesses at trial.  Petitioner may not agree with the questioning at trial of J. Wunder by Mr. Benford, however, "the widespread use of the tactic of attacking trial counsel by showing what 'might have been' proves that nothing is clearer than hindsight -- except perhaps the rule that we will not judge trial counsel's performance through hindsight." Strickland v. Washington, 466 U.S. at 689.

* * *

55

> The actions of Petitioner's counsel in calling J. Wunder as a witness and questioning her regarding Petitioner are strategic and tactical choices. Choices which when looked at under a reasonable standard are choices other reasonably qualified attorneys would make.

(# 8, Ex. 6 at 18-19).

In Wiggins v. Smith, 539 U.S. 510, 521-522 (2003), the Supreme Court emphasized that "[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Furthermore, in the American Bar Association's "Standards for Criminal Justice," which serve as a guide for assessing reasonable conduct, Standard 4-5.2, concerning "Control and Direction of the Case," states as follows:

> (b) Strategic and tactical decisions should be made by defense counsel after consultation with the client where feasible and appropriate. Such decisions include what witnesses to call, whether and how to conduct cross-examination, what jurors to accept or strike, what trial motions should be made, and what evidence should be introduced.

ABA Standards for Criminal Justice, Standard 4-5.2.

It is clear from Mr. Benford's testimony at Petitioner's omnibus hearing that he made a strategic decision not to call Julie Hupp as a witness at Petitioner's trial because he did not believe she would make a good impression on the jury. In addition to Ms. Wunder's testimony about Petitioner coming into her office that morning, the defense also offered the testimony of Tammy Hoose, stating that she was in Petitioner's car at the time that he

56

stopped at the insurance agency, and that Petitioner then dropped her off at the Adult Learning Center, where she signed in at 8:45 a.m.  Thus, Ms. Hoose's testimony corroborated that of Ms. Wunder that Petitioner was in her office around 8:20 to 8:40 a.m.

Absent a finding of unreasonableness, the strategic choices of counsel are not subject to review for ineffective assistance of counsel.  The undersigned proposes that the presiding District Judge **FIND** that Mr. Benford's performance was not objectively unreasonable under the circumstances and, thus, Petitioner has not demonstrated that Mr. Benford's conduct was constitutionally ineffective.  Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that the state courts' decisions denying Petitioner habeas corpus relief on this claim were neither contrary to, nor an unreasonable application of, clearly established federal law, and that Respondent is entitled to judgment as a matter of law on this claim.

b.   Failure to request lesser-included offense instructions.

Petitioner also alleges that Mr. Benford provided ineffective assistance because he failed to request that the trial court instruct the jury on non-aggravated robbery and false imprisonment, which he alleges are lesser-included offenses of aggravated robbery and kidnapping.  Petitioner's federal petition states in pertinent part:

57

The only reference to a weapon in this case was Ms. Johnson's supposition because petitioner had "his hand inside his shirt" (Trial Transcript, p. 152) she thought he had a gun.   After she entered his vehicle, they proceeded to her apartment where petitioner continued to cajole Ms. Johnson.   Even though she claims she wrestled and quarreled with petitioner in her apartment, Ms. Johnson never saw a weapon.   Petitioner never said he had a weapon nor did petitioner make any gesture like he had one.   Ms. Johnson never testified that she was put in fear because petitioner had a gun, outside of her "hand-in-shirt" testimony.  * * *  The absence of a firearm reduces the offense to Robbery in the Second Degree, however, defense counsel did not request instruction for Robbery in the second degree.

Ms. Johnson said she and petitioner reportedly argued until Ms. Johnson said she figured out a way to get the money.   She said she asked petitioner if he would leave if she got it and he said yes.   (Trial Transcript, p. 153-156).   Given the absence of clear and decisive proof of asportation at this point, if the facts related by Ms. Johnson are true and credible, the most he can be guilty of is the common law misdemeanor of false imprisonment.   Defense counsel did not request an instruction on false imprisonment, a lesser included offense of kidnapping in West Virginia.

(# 1 at 11).

As noted in the discussion of Ground Four above, although non-aggravated robbery is a lesser included offense of aggravated robbery under West Virginia law, it is clear that such a lesser included offense instruction was inappropriate under the facts and circumstances of Petitioner's trial, because Petitioner had only raised an alibi defense, and because there was sufficient evidence of the essential elements of the greater offense of aggravated robbery.   Therefore, Respondent asserts that Mr. Benford's failure to request a lesser included offense instruction cannot be

considered unreasonable.  (# 9 at 18-19).

Respondent further states:

The victim testified that the Petitioner ordered her
into his vehicle as he held "his hand underneath his
shirt." (Resp't Ex. 8 at 152.)  The Petitioner demanded
money from the victim.  The victim also testified that
during the course of the abduction and robbery, the
Petitioner threatened to break her neck, threatened to
kill her, and twisted her arm behind her back.  (Resp't
Ex. 8 at 153-55.)

* * *

The facts presented at trial supported the
conviction for aggravated robbery.  The jury was not put
in the quandary of being forced to either convict the
Petitioner of a charge for which there was insufficient
evidence or outright acquittal.  See Beck v. Alabama, 447
U.S. 625, 637 (1980)("Due process requires a jury charge
on a lesser included offense 'when the evidence
unquestionably establishes that the defendant is guilty
of a serious, violent offense-but leaves some doubt with
respect to an element that would justify conviction of a
capital offense . . .").  Therefore, no prejudice ensued
from instruction of the court and the verdict.  No
physical evidence of the weapon was required under West
Virginia law for a conviction of aggravated robbery.

(# 9 at 20-21).

Concerning the failure to give a lesser included offense

instruction concerning false imprisonment, the court has already

established that there is no such crime, either as a felony or a

misdemeanor, in West Virginia.  Thus, Respondent argues that Mr.

Benford's failure to request such an instruction was not

unreasonable or unduly prejudicial.  (Id. at 21).

In his Traverse, as previously noted, Petitioner asserts that

there is an evidentiary dispute and "a decisive absence of proof

that petitioner had a firearm."  (# 12 at 2).  Petitioner further

states:

> While it is the defense attorney's responsibility to
> propose jury instructions consistent with the defense
> being offered, this responsibility cannot be discharged
> in a vacuum.  Why Mr. Benford did not offer lesser
> included offense instructions is unknown.  The State
> Court did not require Mr. Benford to identify the
> considerations or rationale for not requesting the lesser
> included offense instruction.

(Id. at 1).

The state habeas court addressed this claim of ineffective

assistance of counsel as follows:

> The West Virginia Supreme Court of Appeals has spoken
> regarding the issue of including a jury instruction on
> lesser-included offenses when the defendant relies on an
> alibi as their defense to a greater offense [quoting from
> State v. Neider as discussed supra].
>
>                    *  *  *
>
>     Petitioner used alibi as a defense therefore he was
> not entitled to a lesser included offense instruction.
> Petitioner has failed to prove by a preponderance of the
> evidence his trial counsel, Mr. Benford, was ineffective.

(# 8, Ex. 6 at 19).

The SCAWV's interpretation of state law is conclusive and

binding on this federal court.  See Wainwright v. Goode, 464 U.S.

78, 84 (1983); Garner v. Louisiana, 368 U.S. 157, 169 (1961)("the

views of the state's highest court with respect to state law are

binding on the federal courts."); Faircloth v. Finesod, 938 F.2d

513, 517 n.9 (4th Cir. 1991)("This court is bound by the state

court's interpretation, and must assume that the statute says what

the state court says it says.")

This concept was recently reiterated in a ruling on a section 2254 petition filed in the Northern District of West Virginia: "The determination of the intent of the Legislature of the State of West Virginia is solely within the province of the West Virginia Supreme Court of Appeals and its subordinate courts, not with the federal courts. It is not the role of the federal judiciary to contradict the state courts on their law." Jones v. Painter, 140 F. Supp.2d 677, 679 (N.D. W. Va. 2001)(Broadwater, J.). The Jones court further stated: "Claims that a state court misapplied its own statutes are not proper for litigation on federal habeas corpus." Id.

It is apparent that Petitioner was not entitled to jury instructions on non-aggravated robbery or false imprisonment under West Virginia law. Accordingly, the undersigned proposes that the presiding District Judge **FIND** that the failure of Petitioner's counsel to request such jury instructions was not objectively unreasonable, and that Petitioner's defense was not unduly prejudiced by that failure. The undersigned further proposes that the presiding District Judge **FIND** that the state courts' denial of habeas corpus relief on this claim were neither contrary to, nor an unreasonable application of, clearly established federal law, and that Respondent is entitled to judgment as a matter of law on this claim.

**4.   Grounds Five and Eight - Sufficiency of Evidence.**

In Grounds Five and Eight, respectively, of his federal petition, Petitioner alleges that there was insufficient evidence to support his conviction on charges of aggravated robbery and kidnapping.   In Ground Eight, Petitioner also challenges the sufficiency of evidence to support his kidnapping conviction.   The undersigned will first address the standard of review for sufficiency of evidence in a federal habeas corpus proceeding and will then address each claim in turn, using that standard.

In reviewing the sufficiency of the evidence to support a state criminal conviction on a due process challenge in a federal habeas proceeding, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."   Jackson v. Virginia, 443 U.S. 307 (1979).   (# 10 at 17).   The court does not re-try the evidence or re-determine the credibility of the witnesses.   See Wright v. West, 505 U.S. 277, 296 (1992); Marshall v. Lonberger, 459 U.S. 422, 434 (1983).

<u>Ground Five</u>

In Ground Five, Petitioner asserts that there was insufficient evidence of a "threat or presenting of firearm," necessary to convict him of aggravated robbery.   (# 1 at 17).   Petitioner again emphasizes that "the state's case against petitioner depends

entirely on the testimony of Meredith Johnson." (Id.) Petitioner
then recites numerous details from Ms. Johnson's trial testimony.
(Id. at 17-18). Petitioner further states:

> If these facts are true, petitioner contends, it
> would be sufficient to satisfy the essential elements of
> extortion, but they do not satisfy every essential
> element of robbery.
>
> * * *
>
> The distinguishing element which separates extortion
> from aggravated robbery is the actual commission of
> violence accomplished by actual physical contact or by
> the presentation of a deadly weapon. Extortion is
> separated from non-aggravated robbery by placing the
> victim in fear of bodily injury by means other than those
> constituting aggravated robbery.
>
> The difference between robbery and extortion appears
> to be that robbery requires that the threat or use of
> force occur at the same time as the taking of the money
> or property. A threat of future injury coupled with a
> demand for money only constitutes extortion. Extortion
> is distinguishable from robbery primarily by the absence
> of force and violence, by the victim's consent or by the
> lack of fear. State v. McAllister, 65 WV 97. The jury
> verdicts of extortion and aggravated robbery are
> inconsistent.
>
> There is no credible evidence that there was a
> coterminous "threat of presenting a firearm" when Ms.
> Johnson obtained money and gave it to petitioner. No one
> places a firearm in petitioner's hand or within easy
> reach of petitioner. Her act of handing him money in her
> apartment was preceded by no immediate and proximate
> threat of violence with a firearm. Under these fact[s],
> no rational trier of fact could have found all the
> essential elements of the crime beyond a reasonable
> doubt. Jackson, 442 U.S. at 319; Wright v. West, 505
> U.S. 277, 120 L. Ed.2d 225, 237 (1992) robbery.

(Id. at 18-19). Thus, Petitioner asserts that there is
insufficient evidence to support his conviction for aggravated

robbery [although he refers to it as robbery in the first degree, which is the language in the later statute]. (Id. at 19).

Respondent states that "Petitioner claims that this claim should be evaluated for sufficiency in light of subsequent changes to the statute that took effect after he was charged, tried and convicted." (# 9 at 28). As has been stated several times herein, the statute under which all of Petitioner's claims concerning his conviction for aggravated robbery must be evaluated is the statute that was in effect at the time of his conviction.

Respondent's Memorandum of Law further states:

> The victim at trial testified that the Petitioner put her in fear by indicating he had a gun and threatening to break her neck and injure her children. This occurred during the commission of the robbery of $150.00 from the victim.  This is sufficient to sustain a conviction under the statute in effect at the time the Petitioner was tried and convicted.  The totality of the evidence supports the Petitioner's conviction for aggravated robbery.

> Moreover, the conviction rested on the testimony of the victim which renders this claim a matter of witness credibility.  Matters of witness credibility are beyond the scope of appellate review absent a showing that the witness was inherently incredible.  "Section 2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them." Marshall, 459 U.S. at 434.  The jury is free to believe the uncorroborated testimony of a single witness and this will be sufficient evidence. See, e.g., United States v. Wilson, 115 F.3d 1185, 1190 (4th Cir. 1997).

(Id. at 29-30).

During Petitioner's trial, the court instructed the jury that, in order to find Petitioner guilty of aggravated robbery, they had

to find the following elements beyond a reasonable doubt:

    1.    The Defendant, Jackie M. Martin,

    2.    in Wood County, West Virginia,

    3.    on or about a day in January, 2000,

    4.    did take,

    5.    from the person or presence of M.A.J.;

    6.    by the threat of a firearm,

    7.    U.S. currency of some amount,

    8.    by the threat of presenting a firearm, to-whit, a gun,

    9.    with the intent to permanently deprive M.A.J. thereof.

(# 8, Ex. 8 at 488).

The testimony of Meredith Johnson, which was not found to be inherently incredible, is, alone, sufficient to satisfy the essential elements of aggravated robbery, because she stated that she feared that Petitioner, whom she believed to be a police officer, had a gun when he ordered her to get into his vehicle. The jury heard all of the evidence concerning Petitioner's alibi defense and clearly chose not to believe it.

Based upon an exhaustive review of the evidence presented in the light most favorable to Petitioner, the undersigned proposes that the presiding District Judge **FIND** that there was sufficient evidence presented to allow any rational trier of fact to find that Petitioner committed the essential elements of aggravated robbery

beyond a reasonable doubt.  Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that the state habeas courts' denial of habeas corpus relief on this claim were neither contrary to, nor an unreasonable application of, clearly-established federal law, and that Respondent is entitled to judgment as a matter of law on this claim.

<u>Ground Eight</u>

In Ground Eight of his federal petition, Petitioner asserts that there was insufficient evidence of the essential statutory elements of kidnapping, and insufficient evidence to satisfy the preconditions of a life sentence for his kidnapping conviction. Petitioner states:

> Kidnapping is a continuous offense.  However, i[n] this instance, Ms. Johnson had multiple opportunities to sever any connection with petitioner and either notify the police or another adult that she was being held against her will.  For example, Ms. Johnson made no effort to secure assistance from Selma Anderson, a relative, who entered the apartment a mere thirty minutes after petitioner arrived.

> Kidnapping may be deemed an aggravated form of false imprisonment.  If one accepts Ms. [Johnson's] testimony at face value, petitioner forcibly confined her to her apartment until she proposed borrowing money from the National Check Exchange in Marietta, OH.  Such confinement may constitute false imprisonment. Kidnapping is terminated when the victim is released.

> Ms. [Johnson] regain[ed] autonomy when she exercised her free will and volition to drive to Marietta with petitioner as a passenger and return to Williamstown where Petitioner exited the vehicle before Ms. Johnson went to the bank.  After petitioner exited her car, Ms. Johnson did not drive directly to the police station, she did not call the police, she cashed the check and

66

searched for petitioner.

* * *

Therefore, the evidence was insufficient, factually
and legally, to support a conviction of kidnapping
independent and separate of the convictions for extortion
and robbery.

(# 1 at 22-23).

Respondent's Memorandum of Law states:

This claim, as before, relied chiefly on the
credibility of the victim's testimony.  It fails for the
same reason.

The victim testified that she was forced against her
will out of fear of bodily harm to get into the
Petitioner's car.  The Petitioner repeatedly threatened
her and her family throughout the ordeal.

The victim testified that when the Petitioner drove
up beside her and opened the truck door "[h]e had his
hand underneath his shirt" and demanded that she get in.
(Resp't Ex. 8 at 152).  The victim testified that she was
"scared" because she thought his gesture meant he had a
gun.  (Id.)  The Petitioner drove to the victim's
apartment and "twisted [her] neck and it cracked" then
said "[n]ow just think if I would have just broke your
f—ing neck." (Id. at 153.)  When the victim asked to be
freed, Petitioner said he'd kill her if she left.  (Id.
at 154.)  When the victim's grandmother came to the door
of the victim's apartment during the ordeal, the
Petitioner answered the door while he stood beside the
victim and held and twisted her hand.  (Id. at 155.)  The
Petitioner demanded money from the victim and told her he
would leave her and her children alone if she got him the
money he was after.  (Id. at 156.)  The Petitioner then
accompanied the victim to a check cashing agency where
she cashed a check and gave the Petitioner $150.00.
After the victim cashed the check, they returned to her
apartment where the Petitioner then raped her.   The
victim testified that she complied, despite opportunities
to escape, because she feared for the safety of her
children and other family members.

(# 9 at 35).  Respondent asserts that, under the Jackson standard,

67

discussed <u>supra</u>, this evidence was sufficient to support Petitioner's conviction for kidnapping. (<u>Id.</u> at 36).

The state habeas court found as follows on this issue:

> A review of the record, in the light most favorable to the Respondent, indicates there was evidence presented that the Petitioner held Johnson for approximately two to two and a half hours and the Petitioner made Johnson drive him [to] various locations using threats to encourage her cooperation. Accordingly, the Court finds the Respondent carried its burden by proving the elements of Kidnapping at trial in accordance with W. Va. Code § 61-2-14a. The record reflects evidence the jury could use to support it[']s finding Petitioner guilty of Kidnapping.

(# 8, Ex. 6 at 15).

Petitioner's Traverse asserts that "[t]he kidnapping charge rests entirely upon the uncorroborated testimony of the victim and the extremely tenuous, vaporous proof of the fourth element of the offense of kidnapping, i.e. unlawful and felonious force, threat or duress." (# 12 at 21). Petitioner again challenges the credibility of Ms. Johnson's testimony, and further asserts that she "had three opportunities to terminate the alleged unlawful detention." (<u>Id.</u> at 21-23).

At Petitioner's trial, the jury was instructed that, in order to find Petitioner guilty of kidnapping, the jury must find beyond a reasonable doubt that:

1.  The defendant, Jackie M. Martin,

2.  in Wood County, West Virginia,

3.  on or about a day in January, 2000,

    4.    did, by unlawful and felonious force, threat or duress,

    5.    take, confine, conceal or transport out of West Virginia or within this State or otherwise kidnap M.A.J.,

    6.    for the purpose of or with the intent of taking, receiving, demanding or extorting from M.A.J.,

    7.    any money.

(# 8, Ex. 8 at 486).  The evidence presented at trial, taken in the light most favorable to the prosecution, supports a finding of each of these elements.

Thus, the undersigned proposes that the presiding District Judge **FIND** that Petitioner has not demonstrated that no rational trier of fact could have found Petitioner guilty of kidnapping. Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that the state courts' decisions denying Petitioner habeas corpus relief on this claim were neither contrary to, nor an unreasonable application of, clearly established federal law, and that Respondent is entitled to judgment as a matter of law on this claim.

In Ground Eight of his federal petition, Petitioner has also asserted that the imposition of consecutive sentences for kidnapping and robbery "constitutes punishment of petitioner twice for the same transaction."  (# 1 at 23).  The undersigned has already addressed this claim in the analysis of Ground One of Petitioner's federal petition, and found that it lacked merit.

For the same reasons stated above, the undersigned proposes that the presiding District Judge **FIND** that Petitioner has not demonstrated a violation of his constitutional rights based upon his conviction for both kidnapping and aggravated robbery, and the imposition of separate and consecutive sentences thereon. Therefore, the undersigned further proposes that the presiding District Judge **FIND** that the state courts' decisions denying Petitioner habeas corpus relief on this claim were neither contrary to, nor an unreasonable application of, clearly established federal law, and that Respondent is entitled to judgment as a matter of law on this claim.

     **5.   Ground Three - Ex Post Facto claim.**

In Ground Three, Petitioner further asserts that his forty year sentence for aggravated robbery violates the <u>ex</u> <u>post</u> <u>facto</u> clause of the United States Constitution, because the statute governing robbery was amended prior to his sentencing, and he was sentenced under the old statute. (# 1 at 13-14). Petitioner did not raise his <u>ex</u> <u>post</u> <u>facto</u> claim in his state court proceedings. Accordingly, it is unexhausted. Nevertheless, because the claim lacks merit, the undersigned will deny it, despite the fact that it is unexhausted.

Throughout his federal petition, Petitioner has asserted that he should have been sentenced under the amended robbery statute, which became effective on June 4, 2000, prior to his sentencing on

July 14, 2000.  In Ground Three, Petitioner repeats this assertion stating:

> Petitioner was accused of robbing Meredith Johnson on January 6, 2000.  The jury returned a verdict of guilty of aggravated robbery in violation of WV Code § 61-2-12.  The Circuit Court of Wood County sentenced petitioner to the custody of the West Virginia Division of Corrections for imprisonment for forty years on the charge of aggravated robbery.  Under state law, before a sentence greater than ten years may be imposed for Robbery in the First Degree, the jury must determine that the accused "used the threat of deadly force by presenting a firearm or other deadly weapon."  WV Code § 61-2-12(a)(June 4, 2000, c. 80).

> Petitioner was charged with committing a robbery under the 1961 version of the robbery statute.  However, the legislature revised the statute after petitioner committed the offense but before petitioner's conviction was final.

> *  *  *

> In amending the statute, the Legislature clearly changed the language to include the essential element of "the presenting of a firearm or other deadly weapon."  The language of the 2000 statute differed significantly from the 1961 statute inasmuch the Legislature added language that required the actual presentation of a weapon as an essential element of first degree robbery.  State v. Johnson, WV Supp. Ct. of Appeals, No. 32978, Nov. 29, 2006, pp. 3, 7).  Under West Virginia law, when "any punishment be mitigated by (a) new law, such new law, may, with the consent of the party affected thereby, be applied to any judgment pronounced after it takes effect."  WV Code § 2-2-9.  Given the absence of any testimony or other reliable evidence that petitioner possessed, used or presented a firearm during the events of January 6, 2000, petitioner cannot be convicted and sentenced for Robbery in the First Degree.  WV Code § 61-2-12 (2000, c.80).

> *  *  *

> Therefore, petitioner submits that in the absence of satisfactory proof that he actually presented a firearm

in Ms. Johnson's presence, a sentence of forty years in prison exceeds what the law allows and therefore violated the petitioner's rights under the 5th, 8th, and 14th Amendments to the Constitution of the U.S.A. and violates the ex post facto clause of the U.S. Constitution.

(# 1 at 13-14).

Concerning Petitioner's ex post facto claim, Respondent asserts:

"Under ex post facto principles of the United States and West Virginia Constitutions, a law passed after the commission of an offense which increases the punishment, lengthens the sentence or operates to the detriment of the accused, cannot be applied to him." Adkins v. Bordenkircher, 262 S.E.2d 885, 887 (W. Va. 1980).

Between the time the Petitioner was convicted and the time he was sentenced the aggravated robbery statute § 61-2-12 was repealed and re-enacted by the West Virginia legislature. (See Respondent's argument, 2(b) supra).

The statute in effect at the time the Petitioner was indicted and convicted stated that any person using "the threat or presenting" of a firearm was guilty of aggravated robbery and subject to a term of not less than ten years. The Petitioner received a sentence of 40 years - consistent with the statute. The statute in effect at the time the Petitioner was sentenced stated that any person who "uses the threat of deadly force by the presenting of a firearm or other deadly weapon" is guilty of first degree robbery and any person who commits robbery, by placing the victim in fear of bodily injury is guilty of second degree robbery and subject to a sentence of five to eighteen years.

(# 9 at 24-25). Respondent asserts that the penalty for first degree robbery, which was Petitioner's crime of conviction, was not reduced by the amended statute, and that "[t]he statute does not provide that a defendant can benefit from the crafting of a lesser offense after he or she is tried and convicted of a greater

72

offense." Thus, Respondent asserts that there was no <u>ex</u> <u>post</u> <u>facto</u> violation by the imposition of a forty year sentence on Petitioner's aggravated robbery conviction. (<u>Id.</u> at 25-26).

Petitioner's Traverse did not specifically address his <u>ex</u> <u>post</u> <u>facto</u> argument.

The Ex Post Facto Clause prohibits the passage of any ex post facto law, which can best be defined as one which increases the punishment for a criminal act after it has been committed. <u>See</u> <u>Collins</u> <u>v.</u> <u>Youngblood</u>, 497 U.S. 37 (1990). Petitioner was convicted under the statutory language at the time the crime was committed. The West Virginia Legislature did not increase the punishment for aggravated robbery after Petitioner committed the crime. Thus, the undersigned proposes that the presiding District Judge **FIND** that Petitioner has not demonstrated a violation of the Ex Post Facto Clause of the United States Constitution, and that he is not entitled to habeas corpus relief on that basis.

**6.   Grounds Three and Nine - Excessive punishment.**

In Ground Three of his federal petition, Petitioner asserts that his life sentence for kidnapping and his forty years sentence for aggravated robbery are unconstitutional because they constitute cruel and unusual punishment in violation of his Eighth Amendment rights. Petitioner repeats his claim that his life sentence for kidnapping was excessive in Ground Nine of his federal petition.

73

<u>Ground Three</u>

In Ground Three of his federal petition, Petitioner contends that "[w]hen the court imposed a life sentence [for kidnapping], the Court implicitly determined that Ms. Johnson was not returned . . . alive, without bodily harm having been inflicted upon her." (# 1 at 12).  Petitioner further asserts that, because there is no definition of bodily harm in the kidnapping statute, "the Court must look elsewhere for guidance." (<u>Id.</u>) Petitioner then cites to other penal statutes, that define "bodily injury" and "serious bodily injury" as examples.  (<u>Id.</u>)

Petitioner further states:

> In the present case, petitioner, according to Meredith Johnson, left her at her apartment, thus, returning her.  Her only physical effect from the incident was a bruised right wrist.  (Trial Transcript, p. 176, State Exhibit 12).  No cases appear to construe the term bodily harm, but it is argued that it refers to something more significant tha[n] a bruise or scratch which may be caused by even the slightest contact.  In this case, the petitioner allegedly caused the bruise when he gripped the victim's arm too tightly, and not by punching or striking.

> * * *

> Therefore, Petitioner submits that in the absence of satisfactory proof of bodily injury during the kidnapping, a life sentence exceeds what the law allows and therefore, violates petitioner's rights under the federal constitution.

(<u>Id.</u> at 13).  Petitioner also asserts that his forty year sentence for aggravated robbery "exceeds what the law allows." (<u>Id.</u> at 14).

74

Respondent emphasizes that "[a] sentence that is imposed within statutory limits is not generally subject to habeas review." (citing <u>Townsend v. Burke</u>, 334 U.S. 736, 741 (1948)). (# 9 at 22). Petitioner was sentenced within the statutory limits set by the West Virginia legislature on all of his counts of conviction. Respondent further asserts:

> "Reviewing courts, of course, should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes, as well as the discretion that trial courts possess in sentencing convicted criminals." <u>Solem v. Helm</u>, 463 U.S. 277, 290 (1983). Moreover, "outside the context of a capital sentence a proportionality review is necessary only with respect to sentences of life imprisonment without the possibility of parole." <u>Beverati v. Smith</u>, 120 F.3d 500, 504-05 (4th Cir. 1997).

(<u>Id.</u>) Respondent contends that Petitioner has not sufficiently raised a federal constitutional claim concerning cruel and unusual punishment as it relates to the length of his sentences. (<u>Id.</u>)

The Eighth Amendment provides a narrow proportionality guarantee in non-capital cases, which forbids only "extreme sentences" that are "grossly disproportionate" to the crime. <u>Harmelin v. Michigan</u>, 501 U.S. 957, 996-997, 1001 (1991). In a badly-splintered plurality opinion, the Court restricted proportionality review to the "rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality." <u>Id.</u> at 1005.

75

Justice Kennedy, concurring in the opinion, identified four "principles of proportionality review" which were common to the Court's jurisprudence: (1) the primacy of the legislature; (2) the variety of legitimate penological schemes; (3) the nature of our federal system; and (4) the requirement that proportionality review be guided by objective factors.  Id. at 998-1001.

In Ewing v. California, 123 S. Ct. 1179 (2003), the United States Supreme Court again addressed the issue of disproportionate sentences under the Eighth Amendment, applying the proportionality principles recognized in Justice Kennedy's concurrence in Harmelin to a sentence imposed under California's three strikes rule.  The Court found that Ewing's sentence of 25 years to life for felony grand theft was not "the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality."  Id. at 1190 (quoting Harmelin, 501 U.S. at 1005).

The West Virginia legislature has found crimes, such as kidnapping and aggravated robbery, to be severe.  The statute governing the offense of kidnapping provides for a life sentence. The statute further provides that:

> (3) in all cases where the person against whom the
> offense is committed, is returned, or is permitted to
> return, alive, without bodily harm having been inflicted
> upon him, but after ransom, money or other thing or any
> concession or advantage of any sort having been paid or
> yielded, the punishment shall be confinement by the
> division of corrections for a definite term of years not
> less than twenty nor more than fifty; (4) in all cases

> where the person against whom the offense is committed,
> is returned, or is permitted to return, alive, without
> bodily harm having been inflicted upon him or her, but
> without ransom, money or other thing or any concession or
> advantage of any sort having been paid or yielded, the
> punishment shall be confinement by the division of
> corrections for a definite term of years not less than
> ten nor more than thirty.

W. Va. Code § 61-2-14a.

Thus, under this authority, in a case where the court finds

that the victim was returned or permitted to return, but after

ransom or money had been paid, and where the victim suffered bodily

harm, a life sentence would be appropriate.

Respondent asserts:

> The Petitioner abducted his victim and threatened
> her life while demanding that she procure $150.00 for
> him.  During the abduction the Petitioner threatened to
> break her neck.  He threatened her family if she did not
> comply with his demands and he inflicted injury on her
> person.  The evidence presented at trial supported the
> jury's finding of guilt with a recommendation of mercy.
> The trial court imposed the sentence directed by the
> jury's verdict and the language of the statute.

(# 9 at 23).

## Ground Nine

In Ground Nine of his federal petition, Petitioner asserts

that the evidence in his case was insufficient to support a life

sentence for kidnapping, and that he should have been sentenced to

a definite sentence between 20-50 years, based upon the evidence.

Specifically, Petitioner states:

> Three conditions must be satisfied before a life
> sentence for kidnapping may be imposed.  One, a ransom or
> other concession must be made.  Two, the victim must be

77

returned or permitted to return.  And, the victim must not suffer bodily harm.

In this case, there is no dispute in the evidence that the victim was returned or permitted to return.  The disputed conditions are whether a ransom was paid to secure Ms. Johnson's release and whether Ms. Johnson sustained bodily harm.

Petitioner submits the duration of alleged kidnapping is no greater, and probably shorter, than the duration of the alleged robbery in the second degree. The standard kidnapping requires seizure and removal of the victim from a place of safety, her forced confinement, a ransom demand, payment of the ransom and her release.  In this case, there was a substantial deviation from the standard script. One, Ms. Johnson was released when she drove her mother's car to Marietta before any ransom was made or concession made.  Two, any movement of Ms. Johnson after she offers to obtain one hundred and fifty dollars was of her own free will and volition and cannot be deemed "forced movement" necessary to satisfy the asportation element of the kidnapping statute.

And three, the second condition that must be met is bodily harm.  It must be an actual physical injury and not psychological injury.  And the injury must be equal or greater than the "substantial physical pain, illness or impairment of physical condition" that the law requires before sentencing a defendant for stalking, WV Code § 61-2-9(A)(b)(6 mos.), for injury to passenger, WV Code § 61-2-16 (2-6 mos.), WV Code § 61-2-29(e) (5-15 yrs); WV Code § 61-2-28 (1-10 yrs) and WV Code § 61-5-17 (1-5 yrs.)  To hold otherwise, would nullify the state constitutional provision requires punishment to be proportionate to the character and degree of the offense. WV Constitution, Art. III, § 5.

Therefore, the Court violated the constitutional guarantee that petitioner would be given no sentence greater than what the law allows when a life sentence was imposed for kidnapping.  The necessary and essential preconditions were not established.

(# 1 at 23).

Respondent asserts that this claim is "purely one of a state court applying a state law." (# 9 at 37). Respondent further asserts that this claim has no merit:

> The kidnapping statute states in pertinent part: "in all cases where the person against whom the offense is committed is returned, or permitted to return, alive, without bodily harm, having been inflicted upon him, but after ransom, money or other thing, or any concession or advantage of any sort has been paid or yielded, the punishment shall be confinement . . . for a definite term of years not less than twenty nor more than fifty." W. Va. Code 61-2-14a(3).
>
> The victim testified that the Petitioner inflicted bodily harm on her when he grabbed her neck and twisted and when he twisted and bruised her wrist (he also raped her). Neither the West Virginia Supreme Court nor the West Virginia legislature has defined "bodily harm" for purposes of the kidnapping statute. Therefore, it is a fact determination for the jury. The jury returned a general verdict of guilty of kidnapping and recommended mercy. The sentencing judge imposed the statutory sentence consistent with the jury's verdict.
>
> Only a state court's arbitrary disregard of the state sentencing law and imposition of an unauthorized sentence may violate the defendant's due process rights. See Hicks v. Oklahoma, 447 U.S. 343, 346 (1980); Whalen v. United States, 445 U.S. 684, 689-90 n.4 (1990). The Petitioner has demonstrated no such violation.

(Id.)

Petitioner's Traverse repeats his assertion that Ms. Johnson suffered no serious bodily harm and, thus, the trial court "imposed a sentence inconsistent with the evidence elicited at trial." (# 12 at 24). Petitioner again cites to other West Virginia statutes that define "bodily injury" and "serious bodily injury" to support his argument that, since the kidnapping statute does not define

79

"bodily harm," it must be read in pari materia with other penal statutes defining those terms. (Id. at 24-26).

Petitioner also implies that the money Ms. Johnson paid him was not a "ransom," and thus, the evidence fails to support that element as well. (Id. at 26). Thus, Petitioner states, [i]n the absence of bodily injury, and in the absence of any ransom being paid, any sentence greater than twenty years is contrary to the lawful statutory penalty" and "the imposition of an unauthorized life sentence violated petitioner's right to due process of law . . . ." (Id.)

The state habeas court found as follows on Petitioner's claims that his sentences were excessive:

> The Court finds Petitioner's sentence does not "shock the conscience" as the West Virginia Supreme Court has upheld a 140-year sentence for aggravated robbery and kidnapping [,finding that it] did not "shock the conscience." State v. Phillips, 199 W. Va. 507, 485 S.E.2d 676, 682 (1997). Consequently, the Court proceeds to the objective test. The Court must first look at the nature of the offense and the legislative purpose behind the punishment. The West Virginia Supreme Court had observed, "aggravated robbery in West Virginia has been recognized as a crime that involves a high potentiality for violence and injury to the victim involved. The same is true for kidnapping. Consequently, the legislature has provided the circuit courts with broad open-ended discretion in sentencing individuals for the offenses of aggravated robbery and kidnapping." Id. at 683. The Court feels Petitioner['s] sentence was within the discretion of the Judge and that Petitioner's sentence was in line with other punishments for similar offense within other jurisdictions and within the same jurisdiction. Therefore, the Court finds Petitioner's sentence did not violate his rights against disproportionate, cruel and unusual punishment.

80

(# 8, Ex. 6 at 10).

During Petitioner's sentencing hearing, the court made the following findings on the record:

> But on the kidnapping issue, the Court finds that there was a benefit or concession extracted. The Court also finds that there was bodily harm done to Meredith Johnson, that her arm was bruised by the Defendant by holding her so tightly that bruises were inflicted upon her arm.
>
> Also, there was sexual abuse by forcible compulsion. Our Supreme Court has said that that is a crime of violence, which indeed it is. I'm not sure that they have said in a case, that's bodily harm; however, certainly there's physical and emotional abuse involved in that. So, also during the course of the kidnapping, sexual abuse by forcible compulsion occurred, which is also a substantial factor.
>
> However, the Court does find that there was physical harm and that there was benefit extorted; therefore, the proper penalty under the kidnapping statute would be life rather than one of the lesser offenses.
>
> Now, mercy has been recommended by the jury, and therefore, on the kidnapping charge, the Defendant would be eligible for parole in accordance with the statute.

(# 8, Ex. 8 at 567-568). The court made similar findings in sentencing Petitioner to forty years on his aggravated robbery conviction. (Id. at 570-571).

The undersigned finds that the evidence supported a finding that Petitioner permitted Ms. Johnson to be returned, but only after she had paid him money and suffered some bodily harm. The undersigned cannot find that a life sentence, with mercy, which was within the limits set by the state legislature for the crime of kidnapping, shocks the conscience of the court or society.

81

Similarly, Petitioner's sentence of forty years, which is within the statutory limit set by the West Virginia Legislature for the crime of aggravated robbery, is not "grossly disproportionate" to that crime.

Accordingly, the undersigned proposes that the presiding District Judge **FIND** that Petitioner has not demonstrated that his forty year sentence on his conviction for aggravated robbery, or his consecutive life sentence with mercy on his conviction for kidnapping, constitutes cruel and unusual punishment, or that those sentences in any way violate his federal constitutional rights. The undersigned further proposes that the presiding District Judge **FIND** that the state courts' decisions denying habeas corpus relief on this claim were neither contrary to, nor an unreasonable application of, clearly established federal law, and that Respondent is entitled to judgment as a matter of law on this claim.

### 7.  **Ground Six - Grand Jury improprieties.**

In Ground Six of his federal petition, Petitioner alleges that he was "denied his right to a indictment returned by a properly constituted and impartial grand jury," which petitioner states is secured by the guarantees of a fair trial under the Sixth Amendment to the United States Constitution, and the Equal Protection component of the Due Process Clauses of the Fifth and Fourteenth Amendments.  (# 1 at 20).  Petitioner states:

82

Unidentified members of the Grand Jury of Wood County, WV propounded the following questions which manifest a racial motivation: (1) Is he black? (2) Where is he from? (3) How long has [h]e lived in this area? ([4]) does he have a job in the area? (State v. Martin, Cir. Ct. of Wood County, WV, "Grand Jury Transcript, pp. 24-25, 41; Hereinafter "GJT"); (5) Did you ask her (referring to the victim) if she had been involved with any blacks before? (GJT p. 47, 48); (6) "If this is the gentleman I think it is, and I am pretty sure. He is big, tall real black individual. About as black as that machine there." (GJT, p. 61).

This case involves accusations made by a white female against a black male with whom she had an intimate relationship. It is a scenario reminiscent of the outrages of injustice inflicted upon black men by southern juries. It is obvious a grand juror or several grand jurors considered the ethnic backgrounds of the petitioner and the alleged victim in determining whether to return a true bill. Another factor being tossed into the mix was whether the alleged victim had prior relationships with black males. Petitioner's right to be indicted by a racially-neutral and impartial grand jury was denied or frustrated by these individual[s'] action.

(Id.)

Concerning this claim, Respondent's Memorandum of Law states:

This claim is meritless. There is no federal right of a state prisoner to be indicted by a grand jury. The Supreme Court has concluded that neither the Grand Jury Clause of the Fifth Amendment nor the Due Process Clause of the Fourteenth Amendment requires the state to afford the accused the right to grand jury review before trial. Hurtado v. California, 110 U.S. 516, 534-35 (1884). Likewise, any defect in the grand jury proceedings are rendered harmless following a conviction by a jury. See United States v. Mechanik, 475 U.S. 66 (1986)("the petit jury's verdict rendered harmless any conceivable error in the charging decision that might have flowed from the violation." Id. at 73.) Unless the alleged errors deprived a criminal defendant of the fundamental concepts of a fair trial, due process is not violated. United States v. Morsley, 64 F.3d 907, 913 (4th Cir. 1991).

83

Insofar as the Petitioner is making an allegation of
denial of Equal Protection in the grand jury proceedings
to show a violation of the Equal Protection Clause the
Petitioner must demonstrate that "the procedure employed
resulted in substantial underrepresentation of his race
or of the identifiable group to which he belongs."
Castadena v. Partida, 430 U.S. 482, 494 (1977)(emphasis
added).  The Petitioner has not made this showing.

The Petitioner has not demonstrated how the alleged
flaw in the grand jury proceedings deprived him of a fair
trial.  This claim should be dismissed.

(# 9 at 31-32).

Petitioner's Traverse argues:

Although there is no constitutional mandate that the
states institute prosecutions by a grand jury, see,
Hurtado v. California, 110 U.S. 516, 538 (1884), states
such as West Virginia that do employ grand juries must
comply with the commands of the Fourteenth Amendment
Equal Protection clause. See, Rose v. Mitchell, 443 U.S.
482, 494 (1977).

(# 12 at 16).  Petitioner further asserts that individuals who

served on his grand jury "allowed impermissible factors to

influence their decision indict Petitioner." (Id. at 15).

The state habeas court found as follows on this issue:

Petitioner alleges racial bias and racial
discrimination by members of the Grand Jury against him
due to questions asked by a certain grand juror during
Grand Jury.  After reviewing sections of the grand jury
transcript it is apparent the juror did not indicate any
racial bias or discrimination towards the Petitioner but
was merely asking questions of the witness to help the
juror understand the testimony given by the witness.  In
addition, even if the grand juror were disqualified for
some reason the indictment returned against the
Petitioner would still stand under W. Va. Code § 52-2-12
which states; "No presentment or indictment shall be
quashed or abated on account of the incompetency or
disqualification of any one or more of the grand jurors
who found the same."  Therefore, the Court finds

84

> Petitioner has not proven his right to a fair trial or
> equal protection of the law were violate[d] by a
> preponderance of the evidence.

(# 8, Ex. 6 at 7).

As noted by Respondent, there is no federal right to indictment by a state grand jury. Furthermore, a grand jury has the right to obtain and consider all evidence relevant to its deliberations in order to ascertain the nature of the crime and the identity of the accused. Branzburg v. Hayes, 408 U.S. 665 (1972); Kastigar v. United States, 406 U.S. 441 (1972). The undersigned does not have access to the grand jury transcripts relevant to Petitioner's indictment. However, the state habeas court reviewed at least the relevant portion of the grand jury proceedings and determined that the grand juror or jurors involved did not indicate any racial bias or discrimination. This federal court must afford a presumption of correctness to this factual finding by the state court. 28 U.S.C. § 2254(d).

Petitioner was convicted on all of the charges contained in his indictment. His convictions render harmless any alleged defects in the indictment process. Thus, the undersigned proposes that the presiding District Judge **FIND** that Petitioner has not shown, by clear and convincing evidence, a violation of his right to a fair trial or due process based upon the grand jury proceedings.

Furthermore, Petitioner has not demonstrated, or even alleged in his federal petition, that the grand jury that indicted him excluded members of his racial group. Accordingly, the undersigned proposes that the presiding Judge **FIND** that Petitioner has not sufficiently demonstrated a violation of his equal protection rights.

For these reasons, the undersigned further proposes that the presiding District Judge **FIND** that the state courts' decisions denying habeas corpus relief on this claim were neither contrary to, nor an unreasonable application of, clearly established federal law, and that Respondent is entitled to judgment as a matter of law on this claim.

**8. Ground Seven - Biased juror.**

In Ground Seven of his federal petition, Petitioner alleges that his right to a "jury panel of twenty qualified prospective jurors 'free of exception'" was denied when Sharon Woodyard was selected to be on the jury. (# 1 at 21). Petitioner states:

> Juror Sharon Woodyard is the wife of Detective Woodyard's cousin (Tr. Transcript pp. 46, 84, 101). Detective Woodyard was the arresting officer in petitioner's criminal case and Detective Woodyard was the lead investigator and he testified at trial. Juror Woodyard voted to convict petitioner.
>
> Defense counsel was obligated to use a peremptory strike to remove Mr. Jones (Defendant # 3). Philip Jones knew Detective Woodyard on a first name basis through being classmates who sat next to each other in a class conducted one year before trial. Defense counsel was obligated to use a peremptory strike to remove Mr. Snider

(Defendant # 4).  Mr. Snider had a nephew who is a West Virginia State Trooper who is stationed in Ripley, WV. Defense counsel was obligated to use a peremptory strike to remove Ms. Hamilton (Defendant # 6).  Ms. Hamilton is the first cousin of Danny McCullough, a police officer for the City of Parkersburg.

Mr. Laugherty's neighbor is Doug VanClief and a good friend of Gary Deem.  Mr. VanClief and Mr. Deem are employed as policemen with the City of Vienna.  Mr. Laugherty was excused for cause during individual voir dire for an inability to be impartial due to his beliefs regarding the protection of women and children (Tr. T., pp. 96-97)

Under the substantive law of the State of West Virginia, kinship to either party within the ninth degree is grounds for per se disqualification.  WV Code § 56-6-12 (1923), 61-5-3, 61-6-12; State v. Beckett, 172 WV 817, 820-822 (1983); Doe v. Wal-mart Stores, 210 WV 664, 669 (2001); State v. Riley, 151 WV 364, 383 (1966); State v. Dushman, 79 WV 747 (1917).

Given the absence of an impartial jury panel free of disqualification, petitioner respectfully requests this Court vacate his convictions and grant a conditional writ of habeas corpus.

(Id.)

Respondent's Memorandum of Law states:

The Petitioner claims that the challenged jurors had familial relationships with law enforcement officers including one who was distantly related to an officer who investigated the instant crime and testified at the Petitioner's trial.

* * *

During voir dire, trial counsel asked the jurors who admitted being related by blood or marriage to law enforcement officers:

Of those that raised your hands that do have at least some connection to a police officer by blood or marriage, do any of you feel that because of that connection to police officers

87

> that it would render it difficult for you to
> be fair and impartial where police officers
> will be testifying in a case?  Would you have
> any difficulty at all treating their testimony
> by the same rules and standards that you would
> any other witness?  If you feel you would,
> raise your hand.  None of you would tend to
> believe a police officer over another witness
> just because he's a police officer?

(Resp't Ex. 8 at 85.)

> No juror indicated that he or she was unable to be
> impartial because of a familial or social connection to
> a law enforcement officer.  The juror who stated her
> husband was related to one of the testifying law
> enforcement officers said she did not know him.  (<u>Id.</u> at
> 47).

(# 9 at 33-34).

Petitioner's Traverse states:

> In the state habeas corpus proceedings, the Court
> acknowledged that defense counsel could have asked the
> Court to dismiss Mrs. Sharon Woodyard and Mr. Philip
> Jones for cause upon discovering the existence of their
> relationship with the lead detective in petitioner's
> case, Captain Rick Woodyard.  The Court did not
> indicate[] if the motion would have been granted.
> However, defense counsel did not engage in an extended
> voir dire designed specifically to identify biased
> veni[re]men . . . .  The Habeas Court concluded that
> petitioner failed to prove that his rights to due process
> of law as guaranteed by the Fifth and Fourteenth
> Amendment to the Constitution of the U.S.A. were violated
> by the presence of jurors who were related or acquainted
> with members of the local law enforcement.  Ibid, p. 3.
> There has been no articulated state ruling on
> petitioner's claim that presence of unqualified jurors
> denied petitioner a jury panel "free from exception"
> prior to his exercise of his peremptory challenges under
> the Sixth Amendment to the Constitution of the U.S.A.

(# 12 at 18-19).

The state habeas court found as follows on this issue:

Petitioner's specific allegations of due process rights violations are as follows: (1) Mrs. Sharon Woodyard was Detective Woodyard's cousin's wife, Detective Woodyard was the State's lead investigator; (2) Ms. Hamilton is first cousin of Danny McCullough, a police officer for the City of Parkersburg; (3) Mr. Snider has a nephew, who is a West Virginia State Trooper stationed in Ripley, WV; (4) Mr. Laugherty's neighbor is Doug Vanclief and a good friend is Gary Deem, both with City of Vienna police department; (5) Philip Jones knew Detective Woodyard on a first name basis through being class conducted 1 year prior to trial.

The Court would begin its analysis by drawing attention to the fact that of the above mentioned possible jurors only Mrs. Sharon Woodyard actually served on the jury that convicted Petitioner. Petitioner struck Mr. Snider (Defendant # 4), Mr. Jones (Defendant # 3), and Ms. Hamilton (Defendant # 6) from jury attendance. Mr. Laugherty was excused for cause during individual voir dire, not due to his relationship with City of Vienna policemen, but for his inability to be impartial due to his beliefs regarding the protection of women and children. (T.T. pg. 96-97).

The Court recognizes the West Virginia Supreme Court has held "a prospective juror's consanguineal, marital or social relationship with an employee of a law enforcement agency does not operate as a per se disqualification for cause in a criminal case unless the law enforcement officer is actively involved in the prosecution of this case." (Syllabus point 6, in part, State v. Beckett, 172 W. Va. 817, 310 S.E.2d 883). Capt. Rick Woodyard a member of the Wood County Sheriff's Department did the investigation in Petitioner's case. (T.T. pg. 319)

(# 8, Ex. 6 at 4). The court then discussed the fact that Mr. Snider, Mr. Laugherty and Ms. Hamilton were not per se disqualified because of their relationships to law enforcement officials who were not the investigators in this case. (Id. at 4-5). The court then turned to the relationships of the jurors connected to Detective Woodyard:

The Court will now address Mr. Jones and Mrs. Woodyard. Both Mr. Jones and Mrs. Woodyard stated a relationship with Detective Woodyard. As stated earlier, Detective Woodyard was actively involved in the investigation of Petitioner's case. However, Petitioner's counsel was present in the courtroom during voir dire when both Mrs. Woodyard and Mr. Jones stated their relationships with Detective Woodyard. Mrs. Woodyard stated, "I have never met him. It's not a close knit family. I just know that he's my husband's cousin. I've never met him." (T.T. pg. 71) and Mr. Jones ['] only contact was being classmates who sat beside each other one year before Petitioner's trial. (T.T. pgs. 104-106) Both possible jurors responded when asked that their relationships would not have an effect on their ability to serve on the jury.

Petitioner's counsel after hearing their answers and receiving knowledge of the possible jurors['] relationship with the State's leading investigating officer, Detective Woodyard[,] could have asked the Court to dismiss them for cause at that point. Petitioner's counsel could have also asked for individual voir dire of Mrs. Woodyard and Mr. Jones to further determine the extent of their relationship and to further investigate what affect if any the relationship would have on their ability to serve on the jury.

However, Petitioner's counsel never asked for the dismissal of either Mrs. Woodyard or Mr. Jones for cause and never asked for individual voir dire of either possible juror. The Court would find that because Mr. Jones did not actually serve on the jury that convicted Petitioner his presence as a possible juror did not violate Petitioner's due process rights. The Court would further find the presence of Mrs. Woodyard as a juror did not violate Petitioner's due process rights because Petitioner's counsel did not raise the issue during voir dire at trial as grounds for the juror dismissal Petitioner has effectively waived his challenge based upon the relationship between the prospective juror and the investigating officer Detective Woodyard. The Court would also find this rationale would have applied to Mr. Jones had he served on the jury in Petitioner's case.

(Id. at 5). The trial court cites only to West Virginia law holding that the defendants therein were not denied due process by

the presence of a relative of a law enforcement official on their juries.

Petitioner's Traverse challenges the analysis of the state habeas court adding:

> The state habeas court did not identify the correct legal rule from rulings of the U.S. Supreme Court.  I[n] fact, the Court did not identify any clearly established federal law or constitutional rulings of the U.S. Supreme Court.

(# 12 at 19).

The Sixth Amendment provides that an accused shall enjoy the right to a trial by an impartial jury.  This protection is made applicable to the states by the Fourteenth Amendment.  However, "the right to a fair trial by a panel of impartial, 'indifferent' jurors" is really a matter of according the defendant due process of law, which is analyzed under the Fifth and Fourteenth Amendment Due Process Clauses.  <u>Irvin v. Dowd</u>, 366 U.S. 717, 722 (1961).  Sixth Amendment challenges to the makeup of a jury are generally made in situations where the defendant is challenging whether the jury pool from which his or her jury was selected included a "fair cross-section of the community," <u>see</u>, *e.g.*, <u>Holland v. Illinois</u>, 493 U.S. 474 (1990)(race); <u>Duren v. Missouri</u>, 439 U.S. 357 (1979)(gender).

In his state habeas corpus proceedings, Petitioner did assert that African Americans were improperly excluded from his jury venire.  However, the state habeas courts found that there was no

violation of Petitioner's constitutional rights on that basis and that his claim lacked merit.  (# 8, Ex. 6 at 28-29).  Petitioner abandoned that claim in his federal petition.

As noted above, the state habeas court addressed Petitioner's claim concerning Sharon Woodyard's relationship to Detective Woodyard using a due process analysis.  The undersigned proposes that the presiding District Judge **FIND** that, in the context of Petitioner's claim, the Supreme Court's authority using a due process analysis to address alleged juror bias was the correct federal precedent upon which to rely.

The Supreme Court has held that the failure to remove a juror for cause, with the result that the defendant had to use a peremptory challenge to remove the potential juror, does not violate the defendant's right to an impartial jury.  See Ross v. Oklahoma, 487 U.S. 81 (1988).  Thus, the jurors about which Petitioner complains, who were removed by the use of a peremptory challenge, cannot form the basis for a claim that the defendant was denied an impartial jury.

Thus, the only juror with whom the court is concerned is Mrs. Woodyard, as she is the only one who actually sat on Petitioner's jury.  The Supreme Court has held that a verdict may be set aside if a post-trial hearing demonstrates that a juror was actually biased.  See Smith v. Phillips, 455 U.S. 209, 218 (1982).  Absent contrary indications, jurors are presumed to be impartial.  Poynter

92

v. Ratcliff, 874 F.2d 219, 221 (4th Cir. 1989).  The defendant bears the burden of showing a strong possibility of juror bias. Wells v. Murray, 831 F.2d 468, 472 (4th Cir. 1987).

The case cited by Petitioner, State v. Beckett, 310 S.E.2d 883, 888-889 (W. Va. 1983), states that an automatic disqualification arises when "the challenged juror has a close kinship with a law enforcement officer who has taken an active part in the prosecution of the case being tried" (emphasis added). During voir dire, Mrs. Woodyard stated that she had never even met Rick Woodyard, and that her husband's family was not close.  (# 8, Ex. 8 at 71).  Further, Mrs. Woodyard stated that her relationship to Detective Woodyard would have no affect on her ability to render an impartial verdict.  (Id. at 71-72).

Neither Petitioner, nor the prosecution moved to strike Mrs. Woodyard for cause, and neither used a peremptory strike to remove her from the jury.  Furthermore, before the parties' strikes were made, Judge Waters stated, inter alia, "Sharon Woodyard's contact with-- no contact with Captain Woodyard, that obviously is not a factor, even though she's married to his cousin."  (Id. at 101).

"A trial judge's determination of potential juror bias . . . is a factual finding entitled to the presumption of correctness contained in 28 U.S.C. § 2254(d)."  Wainright v. Witt, 469 U.S. 412, 420 (1985).  Petitioner made no effort at his omnibus hearing to demonstrate by clear and convincing evidence that Mrs. Woodyard

93

was actually biased.   Thus, the undersigned proposes that the presiding District Judge **FIND** that Petitioner has not demonstrated by clear and convincing evidence that the factual findings made by the state habeas court were erroneous or unreasonable.

Accordingly, the undersigned proposes that the presiding District Judge **FIND** that Petitioner has not demonstrated that he was denied due process or a fair trial by the fact that Sharon Woodyard was on the jury panel at his trial.   The undersigned further proposes that the presiding District Judge **FIND** that the state courts' decisions denying Petitioner habeas corpus relief on this ground were neither contrary to, nor an unreasonable application of, clearly established federal law, and that Respondent is entitled to judgment as a matter of law on this claim.

**9.    Ground Ten - Denial of complete defense and admission of Rule 404(b) evidence.**

In Ground Ten of his federal petition, Petitioner alleges two claims.   First, Petitioner alleges that the trial court erred in admitting hearsay testimony from the prosecution's witness, Misty Sinclair, under Rule 801(d)(1)(B) of the West Virginia Rules of Evidence.   Second, Petitioner alleges that the trial court erred in granting the State's motion to allow the use of evidence that Petitioner had impersonated a police officer under Rule 404(b) of the West Virginia Rules of Evidence.   Petitioner asserts that the

94

admission of this evidence denied Petitioner a fair trial because he was denied the ability to present a complete defense.   The undersigned will address each claim in turn.

     a.   Admission of Misty Sinclair's testimony.

Petitioner asserts that he was denied a fair trial when the trial court allowed Misty Sinclair to testify about what Meredith Johnson had told her.   Petitioner states:

> The Prosecutor asked Ms. Sinclair "Did she tell you what he'd been saying to her on the phone? (Tr. T. p. 198). Defense counsel objected.   The Court ruled that West Virginia Rules of Evidence, Rule 801(d)(1)(B) allowed such evidence to rebut an implied charge against Ms. Johnson by petitioner of recent fabrication or improper influence or motive. (Tr. T., p. 199).

> Mrs. Sinclair proceed[ed] to relate that Ms. Johnson said that Petitioner had said, "he wanted her to give him more money, that he was in jail, and that he would meet her out in front of the jail, etc." (Tr. T., p. 199). As a consequence of the Court's misapplication of the rule, the State was permitted to introduce the same hearsay statements made by the victim to Patrolman Starkey (Tr. T., pp. 278-279), Detective Rick Woodyard (Tr. T., p. 321), Brad Zollar (Tr. T., p. 214) and J. Boron (Tr. T., p. 222).

> During direct examination, Meredith Johnson had recounted what she contends petitioner had said to her. On cross examination, defense counsel did not attempt to impeach Ms. Johnson about any of her alleged conversations with petitioner. (Tr. T., pp. 178-191).

> Only one question and answer is relevant to those phone calls.

> Question: Now, it is your testimony that of the several phone calls yo[u] had with Mr. Martin that morning of January 6, 2000, that he was threatening you in all of (them)_- except the one where Brad was able to listen in on, and then in that one, he was nice?

> Answer: "Yes, he was extremely nice."   (Tr.
> T., p. 186)

Defense counsel then asked a few questions concerning
what number she dialed when she called petitioner.   (Tr.
T., p. 186-188).

> If a declarant who has made a prior statement
> testifies [at] trial and it['s] subject to cross
> examination, and the prior statement is consistent with
> the declarant's in-court statement and if offered to
> rebut an expressed or implied charge against the
> declarant of recent fabrication, improper influence or
> improper motive, the prior consistent statement is not
> hearsay.

> Mere impeachment by a prior inconsistent statement,
> without imputation of recent fabrication or improper
> influence should not justify rehabilitation by a prior
> consistent statement.  Thus, a prior consistent statement
> offered under West Virginia Rules of Evidence, Rule
> 801(d)(1)(B) is not admissible until there has been
> evidence offered to challenge the credibility of the
> declarant.

> * * *

> There was an improper application of the rule, since
> there had been no impeachment of the victim's testimony
> concerning the substance of the phone calls.  Without any
> foundation and without any basis, the State was permitted
> to pound the jury with six witnesses all relating the
> same hearsay statements.   After hearing the same
> statement from six different witnesses, with successive
> witnesses bolstering Ms. Meredith's credibility through
> a reiteration of her statements, the jurors must have
> concluded that it was gospel.

> Considering that this case rested almost exclusively
> on the victim's credibility, the harm to petitioner's
> case was severe to the point of denying petitioner a fair
> trial and petitioner should be afforded a new trial.

(# 1 at 24-25).

Respondent asserts that the alleged erroneous admission of

evidence in state criminal trials is not cognizable in federal

96

habeas corpus. (# 9 at 38).  Respondent emphasizes that, "in order to prevail, the Petitioner would have to successfully demonstrate that the admission of the evidence impugned the fundamental fairness of the trial or infringed upon specific constitutional protections." [citing <u>Grundler v. North Carolina</u>, 283 F.2d 798, 802 (4th Cir. 1960)].  Respondent asserts that Petitioner has not established the violation of a federal constitutional right.  (<u>Id.</u>)

Respondent further contends:

> Ms. Sinclair's testimony was offered to corroborate the victim's previous testimony about the Petitioner's frequent phone calls made to her prior to the abduction. Ms. Sinclair testified that she was present when the victim received threatening telephone calls from the Petitioner on the morning of the crime. Ms. Sinclair testified about the conversation she had with the victim about the calls and the content of the calls. (Resp't Ex. 8 at 194-201.) The victim also testified extensively about the barrage of intimidating calls she received from the Petitioner prior to the abduction.
>
> Because the substance of the challenged testimony was cumulative and in light of the overwhelming evidence of guilty presented at trial, the admission of the evidence did not render the Petitioner's trial fundamentally unfair. This claim fails.

(<u>Id.</u> at 39).

Petitioner did not address this claim in his Traverse.

The state habeas court made the following findings on this claim:

> The Court has concluded the testimony of M. Sinclair was permissible as the testimony was a prior consistent statement "offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive" in accordance with West Virginia Rules of Evidence, R. 801(d)(1)(B). Additionally, the

Court has concluded this claim does not show an error of constitutional dimension as required for review during habeas corpus proceedings.

* * *

In [State v. Quinn, 490 S.E.2d 34 (W. Va. 1997)], the West Virginia Supreme Court relied on the United States Supreme Court's holding in Tome v. United States to support its holding that under Rule 801(d)(1)(B) in order for a prior consistent out of court statement to be treated as non-hearsay under the provisions of said Rule, the statement must have been made before the alleged fabrication, influence, or motive came into being." 115 S. Ct. 696, 130 L. Ed.2d 574 (1995), 513 U.S. Quinn, at 443.

In applying Quinn to the statements made in the Petitioner's case we find that Petitioner's counsel's opening statement to the jury is analogous to the opening statement made to the jury by appellant's counsel in Quinn.  The Petitioner's counsel argued that:

> ...I think it will show what I've kind of referred to in looking at all the evidence that she was a spurned woman, desperate for money; that Mr. Martin indicated to her that he didn't want - he couldn't have a permanent relationship with her, he was married, and he had tried to help her out . . . . . But we contend that is because she was talking to Mr. Martin, she had a conversation with Mr. Martin, that she was wanting more out of the relationship and he was indicating he just wasn't prepared for something like that, and she was upset , she was crying about that, not because of being threatened . . . . .The thing that was going on here, ladies and gentlemen, was a relationship that was breaking up. That's what was going on.  And Meredith Johnson was obviously upset about that. Mr. Martin realized she was upset.  How upset? That she was upset enough to make these accusations against him . . . . the evidence will show she was - she needed money, she was desperate for money.  (T.T. pgs. 125-133).

* * *

> [T]he Petitioner's counsel suggested to the jury that the
> victim, Meredith Johnson, was so upset about the breakup
> of her relationship with the Petitioner combined with her
> lack of economic resources that she fabricated all the
> allegations against the Petitioner in order to get money.
>
> Therefore, the testimony of M. Sinclair, the store
> employee, B. Zoller, and the store manager, J. Boron, on
> the morning of January 6, 2000 before she left the Farm
> Fresh met the "pre-motive" test for prior consistent
> statements under Rule 801(d)(1)(B) established in Quinn.
> The witness' testimony was permissible to rebut the
> specific motive to fabricate which the Petitioner's
> counsel presented to the jury during opening statement.

(# 8, Ex, 6 at 23-25).

As noted by Respondent, in order to state a cognizable claim,

Petitioner must demonstrate that the court's allegedly erroneous

admission of this evidence impugned the fundamental fairness of his

trial, or infringed upon specific constitutional protections.

Grundler, 283 F.2d at 892; Gaskins v. McKellar, 916 F.2d 941, 949

(4th Cir. 1990).

> While this Court stands ready to correct violations
> of constitutional rights, it also holds that "it is not
> asking too much that the burden of showing essential
> unfairness be sustained by him who claims such injustice
> and seeks to have the result set aside, and that it be
> sustained not as a matter of speculation but as
> demonstrable reality." United States ex rel. Darcy v.
> Handy, 351 U.S. 454, 462, 76 S. Ct. 965, 970, 100 L.
> Ed.2d 1331 (1956).

Beck v. Washington, 369 U.S. 541, 558 (1962).

The erroneous admission of hearsay testimony is a non-

constitutional error, United States v. Tome, 61 F.3d 1446, 1455

(1995). Petitioner asserts that the fact that the jury repeatedly

heard testimony from various witnesses about the allegedly

99

threatening phone calls Petitioner made to Ms. Johnson bolstered Ms. Johnson's testimony and caused the jury to believed that testimony to be true.

Petitioner's counsel objected to the admission of Ms. Sinclair's trial testimony, but only on the basis that she was testifying about Ms. Johnson's state of mind.  The trial court advised the prosecutor to limit the testimony to what Ms. Sinclair had seen and heard.  (# 8, Ex. 8 at 198).  The state habeas court noted that Petitioner did not object to the admission of the prior consistent statements during Ms. Sinclair's testimony, or during the testimony of the other store employees, or the law enforcement officials, who repeated what they saw or were told.  Thus, Petitioner waived the right to raise any claim of error concerning the admission of this evidence on appeal.  (# 8, Ex. 6 at 25).

At any rate, the evidence appears to have been properly admitted under state evidentiary law, and there was certainly other evidence to support Petitioner's convictions.  Petitioner has not demonstrated that its admission impugned the fundamental fairness of his trial.

Accordingly, the undersigned proposes that the presiding District Judge **FIND** that Petitioner has not stated a cognizable claim concerning the admission of this evidence, that the state courts' decisions denying habeas corpus relief on this claim were neither contrary to, nor an unreasonable application of, clearly

established federal law, and that Respondent is entitled to judgment as a matter of law on this claim.

      b.   Admission of evidence under Rule 404(b).

In Ground Ten of his federal petition, Petitioner also alleges that, although the trial court severed the charge against Petitioner of impersonating a police officer, the court ruled that such evidence would be admissible under Rule 404(b) of the West Virginia Rules of Evidence, to show Ms. Johnson's state of mind on the day of the crimes.  Petitioner states:

> The Court, without hearing the purported testimony, and relying solely upon the statements of counsel, ruled the evidence admissible because "it would go to show her state of mind as to duress and fear that she felt at the time of the alleged offenses . . . [I]t would be essential in explaining what happened that day."  The Court limited the evidence to "the fact that she would testify that she believed he was an undercover police officer and what effect that should have upon her."  The Court further ruled that any other 404(b) evidence of that nature would require a separate hearing.  (Tr. T., p. 44).

> During petitioner's trial, Meredith Johnson testified that when she met the Defendant, he told her he was an undercover police officer (Tr. T., p. 138); that she did not call the police in the early morning hours of January 6, 2000 (after the threatening calls demanding $150.00) because "he would find out . . . because she was working with them."  (Tr. T., p. 149); that she called the police shortly after she had given him the money and stated to Lon Starkey of the Williamstown police that the defendant was an undercover task force officer (Tr. T., p. 165); that she agreed to meet Officer Starkey at Napolis instead of Police Headquarters because she was afraid that somebody at the headquarters would tell the defendant that she had reported the incident.  (Tr. T., p. 165, 166).

At the close of direct examination, the trial court cautioned the jury, i.e.,

There's been evidence that the Defendant said he was a police officer.  This is not evidence of the Defendant's guilt or innocence of the charges he's on trial for.  It is only being introduced for the limited purpose to prove what the witness thought and what her mental state was, and that's the sole reason that evidence is being introduced.  (Tr. T., p. 178).

Williamstown Police Officer Lon Starkey testified that shortly after noon of January 6, 2000, he received a call from Meredith Johnson.  She inquired about information concerning domestic abuse and he informed her she could file[] a domestic violence report.  At this point, she informed Officer Starkey that petitioner was the abuser and he worked for the task force.  Officer Starkey ascertained that petitioner was not a member of the task force.  (Tr. T. pp. 275-276).  The Court repeated its cautionary instruction (T. Tr. pp. 284, 285).  Defendant objected to this testimony as hearsay.  The Court overruled the objection.  (Tr. T., pp. 279-280)

The State then called William Minear, Williamstown's Chief of Police.  Again the State introduced evidence that the Defendant was not a[] member of an undercover task force.  Minear also testified to what Starkey and Ms. Johnson told him and the concerns Ms. Johnson had expressed to Starkey.  (Tr. T., p. 288).  Mr. Minear testified to meeting Ms. Johnson at Napolis and gave his opinion about her mental state.  The Court gave no cautionary instruction.

Thereupon, the State reinforced the testimony of Ms. Johnson, Officer Starkey and Chief Minear by calling Rick Woodyard, Detective, Parkersburg Police Department.  Detective Woodyard reiterated the testimony of [] those three witnesses.  (Tr. T., p. 320)

The testimony of Starkey, Minear and Woodyard that Ms. Johnson had told Starkey that the petitioner had told her he was a task force member was erroneously admitted not only because it was hearsay, i.e., offered for the purpose of bolstering the credibility of Johnson's allegation and thus offered for the truth of the matters

asserted, but it was also outside the reasonable limits
of the Court's ruling on the admissibility of the 404(b)
evidence.

(# 1 at 25-27).

Respondent asserts:

As with the previous claim, it is not the province
of this court to determine if the state trial court
misapplied a state court evidentiary rule but only
whether the challenged evidence impugned the fundamental
fairness of the trial.

During the victim's testimony she stated that during
their relationship prior to the crimes, the Petitioner
told her he was an undercover police officer [footnote
omitted]. (Tr. at 138.) Later in her testimony, the
victim testified that when the Petitioner was threatening
her over the phone, she didn't call the police at that
time because she still believed the Petitioner was
"working with them." (Tr. at 149)

The inclusion of the challenged evidence is
irrelevant to the guilt or innocence of the Petitioner.
The evidence was offered by the victim merely as an
explanation of why she was hesitant to contact police for
help. The testimony had no effect on the substantive
issue of guilt or innocence and the evidence did not
contribute to the weight of the evidence against the
Petitioner. If the evidence were removed from the
testimony there was still sufficient evidence to sustain
a finding of guilt.

(# 9 at 39-40). Respondent further asserts that the admission of

this evidence was harmless, in light of the overwhelming evidence

of Petitioner's guilt. (Id. at 40). Petitioner did not address

this claim in his Traverse.

The state habeas court found as follows on this claim:

The evidence was intrinsic with the crime charged
because the victim believed Petitioner was a police
officer up until the day of the crime and that belief led
to the victim's fear and duress during the commission of

103

the crime.   The Court properly admitted the evidence
because it was essential to the jury's understanding of
the crime or the 'complete story of the crime on trial'
and the state of mind of the victim.   Therefore, the
Court finds the claim properly addressed at trial . . .
.

(# 8, Ex. 6 at 11).   The state habeas court further found that

"[t]he Court extensively examined the use of 404(b) evidence during

Petitioner's trial [] before the Court's ruling that permitted use

of the evidence in a limited manner.  (T.T. pgs. 24-45).  The Court

also gave a cautionary instruction to the jury regarding the 404(b)

evidence after the victim's direct testimony.   (T.T. pg. 178)."

(Id. at 14).

In State v. McGinnis, 455 S.E.2d 516 (W. Va. 1994), the SCAWV

explained the process for determining whether evidence of other bad

acts is admissible in a criminal case.   When the State proposes to

present evidence of prior bad acts, the trial court is required to

utilize the four-part analysis set forth in Huddleston v. United

States, 485 U.S. 681 (1998) to determine admissibility.

The evidence must be probative of a material issue other than

character, it must be relevant, the probative value of such

evidence must outweigh risks that its admission will create

substantial danger of unfair prejudice, and the jury must be

instructed that evidence of uncharged bad conduct is not to be

considered as proof of guilt on the present charge but may be

considered in deciding whether a given issue or element relevant to

the present charge had been proven.   In McGinnis the Court stated

104

that the admissibility of 404(b) evidence would be determined by the trial court during an in camera hearing as stated in <u>State v. Dolin</u>, 347 S.E.2d 208 (W. Va. 1986).   In the instant case, the trial court complied with these parameters.

"[T]he violation of a state rule of evidence is not a denial of due process" and "something worse than a garden-variety violation of the standard of 404(b) must be shown to cross the constitutional threshold." <u>Koo v. McBride</u>, 124 F.3d 869, 874-75 (7th Cir. 1997)(quoting <u>Watkins v. Meloy</u>, 95 F.3d 4, 6-7 (7th Cir. 1996).  The trial court's ruling on the admission of evidence under the state evidentiary rule is a question of state law that is binding on this federal court.   Thus, the question before this court is simply whether the admission of such evidence was fundamentally unfair or a miscarriage of justice.

The undersigned proposes that the presiding District Judge **FIND** that Petitioner has not demonstrated that the admission, under Rule 404(b) of the West Virginia Rules of Evidence, of evidence that Petitioner had told Ms. Johnson he was a police officer, when he was not, was fundamentally unfair or a miscarriage of justice and, thus, Petitioner has not demonstrated a violation of his right to due process cognizable in federal habeas corpus.

The undersigned further proposes that the presiding District Judge **FIND** that the state habeas courts' rulings denying of habeas corpus relief on this claim were neither contrary to, nor an

105

unreasonable application of, clearly-established federal law, and that Respondent is entitled to judgment as a matter of law on this claim.

**10. Ground Twelve - Cumulative error.**

In Ground Twelve of his federal petition, Petitioner alleges that "[t]he cumulative effect of the errors enumerated and described [in his petition] denied petitioner his right to a fair and impartial trial as guaranteed by the Fifth, and Fourteenth Amendments to the Constitution of the U.S.A." (# 1 at 28-29). Petitioner states:

> Cumulative error arises whether [sic; when] the trial court commits several errors during a criminal trial. Viewed individually, such errors may be insufficient to warrant a new trial. In the federal courts, cumulative error analysis applies where there are two or more actual errors. Moore v. Reynolds, 153 F.3d 1091, 1113 (10th Cir. 1998) Petitioner realizes that he is not constitutionally entitled to a perfect or error-free trial. Delaware v. Van Arsdall, 475 U.S. 673, 681, 106 S. Ct. 1431, 1436, 89 L. Ed.2d 674 *1986).
>
> * * *
>
> The majority of federal appellate courts have determined that habeas relief may issue when a defendant is denied the due process of law as guaranteed by the Fourteenth Amendment by the cumulative effect of errors committed in a state trial, which together deny fundamental fairness. * * *
>
> In the present case, trial counsel failed to adequately research the applicable law, failed to present a coherent alibi defense, failed to ascertain the date of a news broadcast that he attempted to use to solidify the alibi defense, failed to request instructions for lesser included offenses, and omitted significant issues from the direct appeal.

(# 1 at 28-29).  Petitioner did not raise a cumulative error claim in his state habeas proceedings; therefore this claim is unexhausted.  Nevertheless, because Petitioner cannot successfully demonstrate cumulative error, the undersigned will address the merits of this claim.

Respondent contends that this claim fails because Petitioner has not demonstrated any actual constitutional errors to form the basis for cumulative error.  (# 9 at 42-43).  Respondent adds:

> The Petitioner does not explain how these trial errors individually or cumulatively deprived him of a federally guaranteed constitutional right, nor does he cite to any United States Supreme Court decisions holding that cumulative trial errors which have not been shown to have had a "substantial and injurious effect or influence in determining the jury's verdict" [FN 7 citing <u>Brecht v. Abrahamson</u>,507 U.S. 619, 637 (1993)(quoting <u>Kotteakos v. United States</u>, 328 U.S. 750, 776 (1946)] can form any basis for federal habeas relief.

(<u>Id.</u> at 43).

As noted by Respondent, in <u>Fisher v. Angeleone</u>, 163 F.3d 835, 852 (4th Cir. 1998), the Fourth Circuit held that "legitimate cumulative-error analysis evaluates only the effect of matters actually determined to be constitutional error . . . ."  Thus, in order for a cumulative error analysis to apply, the court must first find that there have been actual constitutional errors.  Petitioner's claim of cumulative error stems from claims which the court has previously found to be non-errors.[5]  Because the court

---

[5]  In his list of alleged errors by his counsel, Petitioner adds a claim that Mr. Benford "omitted significant issues from his

has already found that there were no violations of Petitioner's rights, to the extent that Petitioner raises (as a basis for cumulative error) claims already addressed by the court, those claims lack merit as well.

Accordingly, the undersigned proposes that the presiding District Judge **FIND** that Petitioner was not denied a fair and impartial trial based on the cumulative effect of any alleged errors asserted by Petitioner in his federal petition, and that the state court decisions denying Petitioner habeas corpus relief were neither contrary to, nor an unreasonable application of, clearly established federal law.  The undersigned further proposes that the presiding District Judge **FIND** that Respondent is entitled to judgment as a matter of law on this claim.

**RECOMMENDATION**

For the reasons stated herein, it is respectfully **RECOMMENDED** that the presiding District Judge **GRANT** Respondent's Motion for Summary Judgment (# 8) as to all of the grounds for relief stated in Petitioner's section 2254 petition.  It is further respectfully **RECOMMENDED** that the presiding District Judge **DENY AS MOOT** Respondent's Motion to Dismiss for Failure to State a Claim (# 7).

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the

---

direct appeal."  Such a claim was not raised elsewhere in Petitioner's federal petition or his state habeas proceedings.

Honorable Joseph R. Goodwin, Chief United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have ten days (filing of objections) and then three days (service/mailing) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the district court and a waiver of appellate review by the circuit court of appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984). Copies of such objections shall be served on the opposing party, Chief Judge Goodwin, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to mail a copy of the same to Petitioner and counsel of record.

| | |
|---|---|
| February 12, 2008 | Mary E. Stanley |
| Date | Mary E. Stanley<br>United States Magistrate Judge |